## U.S. DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| COMMITTEE TO DEFEND THE PRESIDENT, 203 South Union Street, Suite 300 Alexandria, VA 22314<br><br>*Plaintiff*, | ) ) ) ) ) ) |
| v. | ) ) |
| FEDERAL ELECTION COMMISSION, 1050 First Street NE Washington, DC 20463,<br><br>*Defendant*, | ) ) ) ) ) ) |

## VERIFIED COMPLAINT

Plaintiff COMMITTEE TO DEFEND THE PRESIDENT brings this action for injunctive and declaratory relief and alleges as follows:

### INTRODUCTION

1. This lawsuit seeks to compel the Federal Election Commission ("FEC") to take action on an administrative complaint the Committee to Defend the President ("CDP") filed with the FEC four months ago disclosing the existence of an unprecedented nationwide scheme to violate federal campaign finance law in which $84 million was effectively laundered over more than a year by the Hillary Victory Fund ("HVF") through dozens of state political party committees to the Democratic National Committee ("DNC") and, ultimately, to Hillary for America ("HFA").

2. The 2016 Democratic Presidential nominee Hillary Rodham Clinton; Hillary Victory Fund, Clinton's joint fundraising committee; Hillary for America, Clinton's campaign committee; the DNC; and dozens of Democratic state parties across the country entered

1

into the exact type of arrangement the Supreme Court declared in *McCutcheon v. FEC* would so flagrantly violate campaign finance law that it was "unlikely" to occur. The Court was unable to anticipate the extent and sheer audacity with which Democrats would conspire to circumvent, evade, and effectively nullify candidate contribution limits.

3. Federal law does not permit the FEC to investigate alleged violations of campaign finance law unless and until the Commission votes there is "reason to believe" a violation occurred based on an Administrative Complaint and any responses filed by the respondents. 52 U.S.C. § 30109(a)(2). This standard is far lower than either "probable cause," *cf. id*. § 30109(a)(3), or the preponderance standard a district court would apply, *cf. id*. § 30109(a)(6).

4. The Administrative Complaint CDP filed with the FEC contained detailed spreadsheets and explanations citing to the hundreds of specific line-item entries in scores of publicly available FEC filings that demonstrate:

   a. virtually every single reported disbursement from HVF to a state party resulted in an immediately reported transfer of the same amount of funds from the state party to the DNC; and

   b. over 99% of funds reportedly transferred through HVF to state parties wound up at the DNC.

5. CDP's Administrative Complaint also contained public statements from both the then Chairwoman of the DNC, Donna Brazile, and HFA's Chief Financial Officer, Gary Gensler, confirming HFA controlled the DNC's finances, strategy, and expenditures. That is, the funds raised through HVF ended up under the direction and control of HFA. Press

accounts reveal the Clinton campaign controlled the transfer of funds into and out of state

party accounts, and some state party officials were unaware of transfers until after the fact.

6. The state parties' reports also contain dozens of inconsistencies with HVF's and DNC's reports that both violate federal reporting requirements on their own and raise troubling questions about whether the transactions being reported even occurred.

7. In light of the magnitude of this unprecedented conspiracy to flout federal campaign finance law in a failed attempt to secure the Presidency for Hillary Rodham Clinton, the amount of money involved, the nationwide scope, and the fact that the 2020 presidential cycle is already underway, it is imperative this Court ensure the FEC take appropriate enforcement action in a timely manner pursuant to 52 U.S.C. § 30109(a)(8). In particular, the FEC's failure to find "reason to believe" federal campaign finance law has been violated, despite the voluminous evidence set forth in CDP's complaint is arbitrary, capricious, and contrary to law.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 2201, because it arises under a federal statute and seeks, in part, declaratory relief.

9. Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendant is an entity of the U.S. Government.

**PARTIES**

10. Plaintiff COMMITTEE TO DEFEND THE PRESIDENT ("CDP") is a non-connected hybrid PAC headquartered in Alexandria, Virginia.

11. Defendant FEDERAL ELECTION COMMISSION ("FEC") is the federal agency charged with enforcement of the Federal Election Campaign Act ("FECA") and is located in Washington, D.C.

## THE FEC'S FAILURE TO TAKE ACTION
## ON CDP'S ADMINISTRATIVE COMPLAINT

12. On December 15, 2017, CDP filed a Complaint (hereafter, "Administrative Complaint") with the FEC against Hillary Rodham Clinton, the 2016 Democratic nominee for President of the United States; Hillary for America ("HFA"), Clinton's principal authorized candidate committee; DNC Services Corp. / Democratic National Committee ("DNC"); William Q. Derrough, Treasurer of the DNC; 38 state political party committees; Hillary Victory Fund ("HVF"), the joint fundraising committee formed by HFA, the DNC, and those state party committees; and Elizabeth Jones, HVF's treasurer.

13. The Administrative Complaint was written, signed, notarized and verified under penalty of perjury as required by 52 U.S.C. § 30109(a)(1).

   a. Exhibit 1 to the Complaint is an Excel spreadsheet containing citations to the specific FEC filings, page numbers, and transaction identification numbers for each step of each transaction through which HVF funneled contributions it received to the DNC.

   b. Exhibit 2 to the Complaint is an Excel spreadsheet identifying all of the DNC's coordinated expenditures with HFA.

14. A true and complete copy of the Administrative Complaint and all exhibits is appended to this Complaint as Exhibit 1.

15. On or about December 21st, 2017, The FEC acknowledged it received the Administrative Complaint on December 15, 2017. A true and complete copy of the FEC's acknowledgement is attached to this Complaint as Exhibit 2.

16. On or about December 21, 2017, the Enforcement Division of the FEC's Office of General Counsel ("OGC") assigned Matter Under Review ("MUR") number 7304 to the Administrative Complaint.

17. On information and belief, the FEC notified the respondents of the Administrative Complaint within five days of its receipt, pursuant to 11 C.F.R. § 111.5(a), and provided them with an opportunity to submit a response within 15 days, pursuant to 11 C.F.R. § 111.6(a). On information and belief, OGC has not yet prepared a report for the Commission pursuant to 11 C.F.R. § 111.7 containing a preliminary legal and factual analysis of the Administrative Complaint based on the complaint itself, attached exhibits, and any responses received. Despite an abundance of detailed documentary evidence consisting almost entirely of public filings with the FEC, and a surfeit of time, the Commission has not yet voted on whether there exists "reason to believe" a "possible violation" of federal campaign finance law exists to authorize an investigation into the Administrative Complaint's allegations.

## THE ALLEGATIONS IN CDP'S ADMINISTRATIVE COMPLAINT

18. The Administrative Complaint CDP filed with the FEC alleges the existence of a conspiracy to funnel—effectively launder—nearly $84 million from an undetermined number of unnamed individual contributors to HVF (Clinton's joint fundraising committee), and then through a series of nearly 40 state parties to the DNC. Public statements from the DNC's former chairwoman Donna Brazile reveal that the DNC

transferred the HVF funds it received through the state parties to HFA.  She further disclosed that the Clinton campaign also directly controlled the DNC's funds.  And the DNC made coordinated expenditures with HFA, which campaign finance law treats as contributions to HFA.

19. As the Administrative Complaint explains:

> Based on publicly available FEC records, repeatedly throughout the 2016 presidential campaign, HVF would purportedly transfer funds to its constituent political committees, which included between 34 and 40 state parties. On the very same day each of these transfers supposedly occurred, or occasionally the very next day, every single one of those state parties purportedly contributed all of those funds entirely to the DNC. The uniformity, regularity, magnitude, immediacy, and extent of these reported transfers—every single state party transferring every single disbursement it received from HVF, in its entirety, exclusively to the DNC, immediately upon receipt—inexorably leads to the compelling inference, supported by public statements, HVF's members had an understanding or agreement to automatically funnel funds they received through HVF to the DNC.

Exh. 1 at 8; *see also id*. at 10 ("[T]he virtually unbroken pattern demonstrates state parties were being used as intermediate pass-through entities to funnel over 80 million dollars in contributions HVF received to the DNC, in violation of federal contribution limits, earmarking restrictions, and reporting requirements.").

20. The Administrative Complaint further alleges, "The DNC, in turn, contributed most of those funds to HFA, made coordinated expenditures with HFA and otherwise transferred control of its money to HFA, as both the DNC's own public filings and former DNC Chairwoman Donna Brazile's public confessions make clear." *Id*. at 8.

21. The Administrative Complaint reiterated, "[V]irtually every single disbursement HVF [made] to a state party resulted in an immediate transfer of the same amount of funds from the state party to the DNC. Over 99% of funds transferred through HVF to state parties wound up at the DNC (which, as explained below, made coordinated expenditures with

HFA and otherwise spent its funds subject to the oversight, direction, and control of HFA)."
*Id*. ¶ 52.

22. Each row in the spreadsheet labeled Exhibit 1 to the Administrative Complaint identifies a distinct series of transactions through which funds collected by HVF were reported to flow directly through a series of state parties to the DNC, almost always on the same day. The spreadsheet documents each step in each transaction by citing the particular FEC report documenting it.

23. Each transaction identified in the spreadsheet is structured in substantially the same manner:

   a. HVF reported transferring a certain amount of funds to its state party members on a particular day. For example, HVF reported transferring a total of $505,000 to 17 of its state party members on November 2, 2015, including $19,500 to the Mississippi Democratic Party. *See* Admin. Complaint, Exhibit 1, Row 33 (citing FEC Report # FEC-1180810 (amended), page 1390, Transaction ID # D22497).

   b. Most of those state party members reported receiving transfers in the identical amounts of funds from HVF on the very same day.  The Mississippi Democratic Party did not report receiving any funds from HVF on or about that day, however.

   c. Most of HVF's state party members then reported contributing the same amount of money they received from HVF to the DNC on the very same day (or occasionally the next day). The Mississippi Democratic Party did not report transferring any funds to the DNC on or about that day, however.

   d. Finally, the DNC reported receiving the same amount of funds, also generally on the same day. For example, the DNC reported receiving $19,500 from the

Mississippi Democratic Party on November 2, 2015. *See* Admin. Complaint, Exhibit 1, Row 33 (citing FEC Report # FEC-1039017 (amended), page 6208, Transaction ID # C32017326). This particular example, in which the Mississippi Democratic Party did not report receiving funds from HVF or transferring funds to the DNC, shows many of the transfers in this complex scheme were inconsistently or inaccurately reported, if they were in fact actually received at all.

e. Each transfer of funds from HVF, allegedly through a state party committee, to the DNC is recorded in a separate row of Exhibit 1 to the Administrative Complaint. The last cell in each row cites the specific FEC reports that document—or fail to document—each step of the transaction. For example, Row 33 of Exhibit 1 to the Administrative Complaint sets explains the $43,500 transfer through the Alaska Democratic Party:



f. Through hundreds of transactions with this identical structure outlined in Exhibit 1 to the Administrative Complaint, HVF funneled over 80 million dollars through state parties directly to the DNC, starting in October 2015.

24. Paragraph 101 of the Administrative Complaint summarizes the total amounts of the pass-through transfers from HVF through the state parties to the DNC (where the funds were then either controlled by HFA, used for coordinated expenditures with HFA, and/or transferred to HFA):

| DATE | TOTAL AMOUNT TRANSFERRED TO DNC | TRANSACTIONS ON CHART |
|---|---|---|
| October 1-2, 2015 | $216,000 | Rows 2-10 |
| October 1-2, 2015 (additional transactions w/ inconsistencies among reports) | $48,000 | Rows 12-13 |
| November 2-3, 2015 | $505,000 | Rows 15-31 |
| November 2-3, 2015 (additional transactions w/ inconsistencies among reports) | $102,000 | Rows 33-36 |
| December 1-7, 2015 | $799,400 | Rows 38-63 |
| December 1-7, 2015 (additional transactions w/ inconsistencies among reports) | $83,600 | Rows 65-66 |
| January 4, 2016 | $1,527,278.16 | Rows 68-83 |
| January 4, 2016 (additional transactions w/ inconsistencies among reports) | $73,000 | Row 85 |
| April 2016 | $707,000 | Rows 87-90 |
| May 2016 | $900,000 | Rows 92-95 |
| May 2016 (additional transactions w/ inconsistencies among reports) | $100,000 | Row 97 |
| July 13, 2016 | $5,000,000 | Rows 99-106 |
| July 26, 2016 | $5,438,000 | Rows 108-120 |
| August 11, 2016 | $4,795,000 | Rows 122-138 |
| August 11, 2016 (additional transactions w/ inconsistencies among reports) | $700,000 | Row 140 |
| August 26, 2016 | $5,500,000 | Rows 142-157 |
| September 12, 2016 | $3,200,000 | Rows 159-166 |
| September 12, 2016 (additional transactions w/ inconsistencies among reports) | $350,000 | Row 168 |
| September 26, 2016 | $2,900,000 | Rows 170 – 176 |
| September 26, 2016 (additional transactions w/ inconsistencies among reports) | $300,000 | Row 177 |
| October 6, 2016 | $2,750,000 | Rows 179-185 |
| October 6, 2016 (additional transactions w/ inconsistencies among reports) | $900,000 | Row 187 |
| October 7, 2016 | $550,000 | Row 189 |
| October 11, 2016 | $8,400,000 | Rows 191-201 |
| October 18, 2016 | $4,000,000 | Rows 203-205 |

| | | |
|---|---|---|
| October 18, 2016 (additional transactions w/ inconsistencies among reports) | $275,000 | Row 207 |
| October 20, 2016 | $8,435,000 | Rows 209-229 |
| October 24, 2016 | $1,018,000 | Rows 231-234 |
| October 24, 2016 (additional transactions w/ inconsistencies among reports) | $1,225,000 | Rows 236-237 |
| October 26, 2016 | $7,115,000 | Rows 239-265 |
| October 26, 2016 (additional transactions w/ inconsistencies among reports) | $125,000 | Row 267 |
| October 27, 2016 | $2,075,000 | Rows 269-290 |
| October 27, 2016 (additional transactions w/ inconsistencies among reports) | $15,000 | Row 292 |
| October 31, 2016 | $2,862,000 | Rows 294-321 |
| October 31, 2016 (additional transactions w/ inconsistencies among reports) | $247,000 | Rows 323-324 |
| November 2, 2016 | $1,968,000 | Rows 326-347 |
| November 2, 2016 (additional transactions w/ inconsistencies among reports) | $58,000 | Row 349 |
| November 3, 2016 | $5,772,000 | Rows 351-384 |
| November 3, 2016 (additional transactions w/ inconsistencies among reports) | $1,870,000 | Rows 386-389 |
| November 7, 2016 | $789,000 | Rows 391-423 |
| November 7, 2016 (additional transactions w/ inconsistencies among reports) | $124,000 | Rows 425-429 |
| November 8, 2016 | $974,000 | Rows 431-456 |
| **TOTAL** | **$84,791,278.20** | |

25. The Administrative Complaint also drew three connections between HFA and the funds transferred from HVF through the state parties to the DNC:

    a.  First, former DNC Chairwoman Donna Brazile publicly admitted funds funneled from HVF through state parties to the DNC were then passed along to HFA. Exh. 1, ¶ 104 (quoting Donna Brazile, *Inside Hillary Clinton's Secret Takeover of the*

*DNC*, Politico (Nov. 2, 2017), *at*
https://www.politico.com/magazine/story/2017/11/02/clinton-brazile-hacks-2016-215774). The article described HVF as "'essentially . . . money laundering' for the Clinton campaign." *Id.* ¶ 105.

b. Second, between October 1, 2015 and Election Day, while funds were being funneled from HVF through state parties to the DNC, the DNC also made at least 59 coordinated expenditures with the Clinton campaign (which campaign finance law treats as contributions to HFA), totaling $22,816,531.83. *Id.*, ¶¶ 106-07.

c. Third, throughout the 2016 presidential campaign, Clinton and HFA exercised oversight, direction, and control over the expenditure of DNC funds, causing DNC accounts to be considered Clinton's accounts for purposes of federal campaign finance law. Former DNC Chairwoman Donna Brazile publicly allocuted, "As Hillary's campaign gained momentum, she resolved the party's debt and put it on a starvation diet. It had become dependent on her campaign for survival, for which she expected to wield control of its operations."
https://www.politico.com/magazine/story/2017/11/02/clinton-brazile-hacks-2016-215774. Brazile further revealed, "[T]he Joint Fund-Raising Agreement between the DNC, the Hillary Victory Fund, and Hillary for America. . . . specified that in exchange for raising money and investing in the DNC, ***Hillary would control the party's finances, strategy, and all the money raised***. Her campaign had the right of refusal of who would be the party communications director, and it would make final decisions on all the other staff. ***The DNC also was required to consult with the campaign about all*** other staffing, budgeting, data, analytics, and ***mailings***."

*Id.* (emphasis added). Gary Gensler, the Chief Financial Officer of HFA, stated the Democratic Party was "fully under the control of the Clinton campaign . . . . The campaign had the DNC on life support, giving it money every month to meet its basic expenses, while the campaign was using the party as a fund-raising clearinghouse." *Id.* In July 2016, *Politico* reported, "[W]hat happens to the cash in the Hillary Victory Fund after its initial distribution is left almost entirely to the ***discretion of the Clinton campaign's chief operating officer***, Beth Jones, who serves        as        the        treasurer        of        the        victory        fund." https://www.politico.com/story/2016/07/dnc-leak-clinton-team-deflected-state-cash-concerns-226191 (emphasis added). Consequently, Clinton and HFA exercised oversight, direction, and control over funds over the DNC's funds, including funds the DNC obtained from HVF that were reported as flowing through the state parties. Exh. A, ¶¶ 111-15.

### THE COUNTS IN CDP'S ADMINISTRATIVE COMPLAINT

26. The Administrative Complaint alleges the hundreds of transactions it identifies violated campaign finance law in one or more different ways.

27. Count I, against all Respondents, alleges the use of Democratic state parties to funnel money from HVF, Clinton's joint fundraising committee, to the DNC, and ultimately to HFA, Clinton's campaign committee (whether in the form of contributions to HFA, coordinated expenditures with HFA that legally constitute in-kind contributions, or the grant of control over DNC funds to HFA personnel) constitutes illegal earmarking in violation of 52 U.S.C. § 30116(a)(8) and 11 C.F.R. § 110.6. Exh. 1, ¶¶ 123-30.

28. Count II, against Respondents DNC and its Treasurer, William Q. Derrough, alleges they accepted contributions made by one person in the name of another in violation of 52 U.S.C. ¶ 30122, because over 99% of contributions to HVF, totaling over $80 million, were funneled from HVF through state parties to the DNC.

    a. The uniformity, regularity, magnitude, immediacy, and extent of these hundreds of reported transfers show that, if those transactions actually occurred as reported, HVF's member state party committees were playing an essentially ministerial role, acting as shells in a shell game, with no autonomy, agency, or control of their own.

    b. In substance, contributions to HVF were not actually contributions to its member committees, but rather sham contributions papered through the intermediary state party committee members to the DNC itself (and ultimately HFA). The DNC nevertheless reported receiving contributions from HVF's member state party committees, however, rather than reporting the actual sources of the funds: HVF's contributors. Exh. 1, ¶¶ 131-38.

29. Count III, against Respondents DNC and its Treasurer, William Q. Derrough, alleges they accepted excessive contributions in violation of 52 U.S.C. ¶ 30116(a)(1)(B), because contributions to HVF that were funneled through the state parties to the DNC should be deemed contributions to the DNC.

    a. The uniformity, regularity, magnitude, immediacy, and extent of these hundreds of reported transfers show that, if those transactions actually occurred as reported, contributions to HVF were directly or indirectly earmarked to be transferred through HVF's member state party committees to the DNC, and HVF's member

state party committees were playing an essentially ministerial role and acting as "straw man" intermediaries.

b. These hundreds of virtually instantaneous transfers involving over $80 million were part of a longstanding, prearranged understanding, agreement, or arrangement among HVF, its member state party committees, the DNC, and HFA. Any contributions to HVF that would have resulted in more than $33,400 per contributor passing through its member state party committees to the DNC would violate federal limits on contributions from individuals to national political party committees, as adjusted for inflation. Exh. 1, ¶¶ 139-44.

30. Count IV, against Respondents DNC and its Treasurer, William Q. Derrough, alleges they filed false, inaccurate, and/or incomplete reports in violation of 52 U.S.C. § 30104. When funds were funneled through HVF and the state parties to the DNC, the DNC reported those funds as originating from the state parties rather than either HVF or its contributors. Pursuant to 52 U.S.C. §§ 30116(a)(8) and 30122, contributions to HVF should not be treated as contributions to its member state party committees, but rather as contributions to the DNC. Exh. 1, ¶¶ 145-49.

31. Count V, against all Respondents, alleges they violated 52 U.S.C. § 30104 by filing false reports, if the funds they reported as being transferred from HVF through the state parties to the DNC actually were transferred directly from HVF to the DNC.

a. It is reasonably possible HVF did not actually transfer contributions into its state party members' accounts for moments before they were immediately re-transferred to the DNC, but rather transferred those funds directly to the DNC.

b.  In the alternative, it is reasonably possible based on published press accounts featuring quotes from state party committees that HVF, the DNC, and/or HFA, or their Treasurers, actually maintained control over contributions to HVF and executed the transactions to funnel those funds through the state party committees' accounts to the DNC without the state party committees' prior knowledge or consent concerning those transfers. In either case, Respondents' reports to the FEC claiming the funds were transferred through HVF's member state party committees were intentionally false. Exh. 1, ¶¶ 150-53.

32. Count VI, against the DNC, its Treasurer William Q. Derrough, HFA, and Clinton, for making and accepting excessive contributions in violation of 52 U.S.C. § 30116(a)(1)(B).

a.  Based on public press accounts, including confessions from former DNC Chairwoman Donna Brazile and HFA Chief Financial Officer Gary Gensler, the DNC allowed HFA and its agents to exercise oversight, direction, and control over the expenditure of DNC funds, specifically including but not limited to funds the DNC obtained through HVF.

b.  *Politico* reports, "While state party officials were made aware that Clinton's campaign would control the movement of the funds between participating committees, one operative who has relationships with multiple state parties said that some of their officials have complained that they weren't notified of the transfers into and out of their accounts until after the fact." Kenneth P. Vogel & Isaac Arnsdorf, *Clinton Fundraising Leaves Little for State Parties*, POLITICO (May 2, 2016, 5:21 A.M.), *at* https://www.politico.com/story/2016/04/clinton-fundraising-leaves-little-for-state-parties-222670.

    c. By allowing Clinton and HFA to exercise direction, oversight, and control over the DNC's funds, the DNC made a contribution of those funds to Clinton and HFA. The amount of DNC funds over which Clinton and HFA exercised oversight, direction, and control exceeded the amount of contributions and coordinated expenditures a national political party committee may make with a presidential candidate. Exh. 1, ¶¶ 154-60.

33. Count VII, against Respondent state political party committees, alleges they filed inaccurate and/or incomplete reports in violation of 52 U.S.C. § 30104.

    a. The Administrative Complaint identified over 30 occasions on which HVF reported transferring funds to one or more state parties, or the DNC reported receiving funds from one or more state parties, yet those state parties' reports did not contain corresponding disclosures. Contributions and receipts totaling $10,432,600 were missing from state party reports over a 13-month period.

    b. These numerous violations of federal campaign finance law require no investigation, but rather are immediately apparent from the face of FEC filings from HVF, the DNC, and the state parties; it is indisputable that dozens of transfers HVF reported making to state parties did not appear as receipts on the state parties' reports, and contributions the DNC reported receiving from state parties did not appear as such on the state parties' reports.

**THE ADMINISTRATIVE COMPLAINT PROCEDURE**

34. 52 U.S.C. § 30109(a)(1) authorizes any person to file a written, signed, sworn, and notarized complaint with the FEC alleging a violation of federal campaign finance law.

35. Within 5 days of receiving the administrative complaint, the FEC must notify "any person alleged in the complaint to have committed such a violation." 52 U.S.C. § 30109(a)(1). Any such person "shall have the opportunity to demonstrate, in writing, to the Commission within 15 days after notification that no action should be taken" pursuant to the Complaint. *Id*.

36. After the respondents have been given an opportunity to submit a responsive filing, the Commission must vote on whether "it has reason to believe" a person violated federal campaign finance law. It takes the votes of four Commissioners to approve such a "reason to believe" ("RTB") finding. The RTB vote is based solely on the administrative complaint, any responsive filings, and potentially public FEC records; the Commission is not permitted to undertake any investigation of the complaint or its allegations prior to an RTB finding. *Id*. § 30109(a)(2).

37. Upon making an RTB finding, the Commission must notify the person alleged to have violated the law, and "make an investigation of such alleged violation, which may include a field investigation or audit." *Id*.

38. At the conclusion of the Commission's investigation, OGC must prepare a report setting forth "the legal and factual issues of the case." A copy of the report is provided to each respondent, and they have an opportunity to submit a responsive filing. *Id*. § 30109(a)(3).

39. In most cases, upon receiving OGC's report of the investigation, the Commission must vote whether "probable cause" exists to believe federal campaign finance law was violated. It takes the votes of four Commissioners to make such a probable cause determination. *Id*. § 30109(a)(3), (a)(4)(A)(i).

40. After the Commission makes a probable cause determination, it must attempt to enter into a conciliation agreement with the respondents for a period of 30-90 days. It takes the votes of four Commissioners to approve any such conciliation agreement. *Id*. § 30109(a)(4)(A)(i).

41. If the Commission is unable to reach a conciliation agreement with the respondent, then upon a vote of four Commissioners it may seek monetary or injunctive relief in U.S. District Court. *Id*. § 30109(a)(6)(A).

42. In cases involving violations of certain disclosure requirements, including 52 U.S.C. § 30104(a), (c), (e)-(g), (i); *id*. § 30105, in contrast, the Commission does not make "probable cause" determinations, but instead simply determines that the disclosure requirement was violated and imposes a civil monetary penalty. *Id*. §§ 30109(a)(4)(C)(i)(I)-(II), (a)(4)(C)(iv)(I)-(II). Such penalties are subject to judicial review. *Id*. § 30109(a)(4)(C)(iii).

## COUNT I – FAILURE TO ACT UNDER 52 U.S.C. § 30109(8)(A)

43. CDP hereby realleges and incorporates by reference the allegations set forth in Paragraphs 1 to 43 as if fully set forth herein.

44. CDP filed its Administrative Complaint alleging violations of federal campaign finance law with the FEC on December 15, 2017.

45. Over 120 days have elapsed since CDP filed its Administrative Complaint, and the FEC has failed to act. In particular, on information and belief, the FEC has not even made a "Reason to Believe" finding pursuant to 52 U.S.C. § 30108(a)(2), based on the Administrative Complaint, attached exhibits, and any responses received thereto.

46. Without a Reason to Believe finding, the FEC cannot even initiate an investigation into the Administrative Complaint's verified, documentarily supported allegations. *See* 52 U.S.C. § 30108(a)(2).

47. CDP is aggrieved by the Commissions' failure to act on its Administrative Complaint. 52 U.S.C. § 30109(a)(8)(A) provides, "Any party aggrieved . . . by a failure of the Commission to act" on an Administrative Complaint "during the 120-day period beginning on the date the complaint is filed, may file a petition with the United States District Court for the District of Columbia."  The Court may rule the Commission's "failure to act is contrary to law, and may direct the Commission to conform with such declaration within 30 days."

48. The Commission's failure to act on CDP's Administrative Complaint is arbitrary, capricious, contrary to law, and an abuse of discretion.

WHEREFORE, Plaintiff CDP is entitled to relief under 52 U.S.C. § 30109(a)(8).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff CDP prays for the following relief:

1. A declaratory judgment that CDP is entitled to relief under 52 U.S.C. § 30109(a)(8)(A), (C) and the FEC's failure to act on the Administrative Complaint is arbitrary, capricious, contrary to law, or an abuse of discretion.

2. An injunction compelling the Commission, pursuant to 52 U.S.C. § 30109(a)(8)(C):

   a. to vote pursuant to 52 U.S.C. § 30109(a)(2), no more than thirty (30) days from the date of this Court's order, on whether there exists reason to believe each of the Respondents in the Administrative Complaint has violated the cited provisions of federal campaign finance law based on the Administrative Complaint's allegations and supporting evidence, as well as any responsive filings; and

b. in the event the Commission makes one or more "reason to believe" findings in connection with the Administrative Complaint, to conduct its investigation, vote on whether probable cause exists to believe campaign finance laws have been violated pursuant to 52 U.S.C. § 30109(a)(3), and take any other subsequent steps necessary to enforce the legal provisions at issue, without unreasonable delay.

3. Costs and attorneys' fees pursuant to any applicable statute or authority, including but not limited to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4. Such other relief as this Court deems just and appropriate.

Dated this 16th day of April, 2018.

Respectfully submitted,

/s/ Dan Backer
POLITICAL.LAW
203 South Union Street, Suite 300
Alexandria, VA 22314
(202) 210-5431
dan@political.law
*Counsel for Committee*
*to Defend the President*

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 16, 2018.

/s/ Dan Backer
*Counsel for Committee*
*to Defend the President*