**U.S. DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COMMITTEE TO DEFEND THE PRESIDENT, | ) ) ) ) | |
| *Plaintiff*, | ) ) | No. 18-888 (RDM) |
| v. | ) ) | |
| FEDERAL ELECTION COMMISSION, | ) ) ) | |
| *Defendant*, | ) ) | |

**PLAINTIFF COMMITTEE TO DEFEND THE PRESIDENT'S**
**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

Dan Backer
POLITICAL.LAW PLLC
441 N. Lee Street, Suite 300
Alexandria, VA 22314
(202) 210-5431
dan@political.law
*Counsel for Plaintiff Committee*
*to Defend the President*

## TABLE OF CONTENTS

BACKGROUND ...............................................................................................................1

    A.    Federal Campaign Finance Law ...........................................................1

        1.    Contribution Limits........................................................................1

        2.    Reporting Requirements ...............................................................2

        3.    Joint Fundraising Committees .................................................2

        4.    Anticircumvention Provisions .................................................3

    B.    Administrative Complaint Process .......................................................4

    C.    CDP's Administrative Complaint ........................................................6

    D.    CDP's Challenge to the FEC's Failure
          to Timely Adjudicate Its Complaint ...................................................10

ARGUMENT ................................................................................................................11

I.    UNDER *SPOKEO, INC. V. ROBINS*, THE FEC'S DELAY ITSELF IS
    SUFFICIENT TO CONSTITUTE AN INJURY-IN-FACT TO CDP ....................13

II.    CDP HAS COMPETITIVE STANDING TO SEEK
    ENFORCEMENT OF FEDERAL CAMPAIGN FINANCE
    RESTRICTIONS AGAINST THE DNC AND ITS ALLEGED
    CO-CONSPIRATORS IN PRESIDENTIAL ELECTIONS....................................16

    A.    CDP Suffered Injury From Having to Compete
          in an Illegally Structured Environment...............................................18

    B.    CDP Suffered Injury Because the FEC is Allowing the DNC to
          Relatively Diminish CDP's Voice Concerning Presidential Elections..............20

    C.    CDP Suffered Injury Because, By Refusing to Enforce Campaign Finance
          Restrictions, the FEC Is Conferring Benefits on CDP's Competitors...............22

III.    CDP HAS INFORMATIONAL STANDING TO SEEK ACCURATE
    INFORMATION THE DNC AND ITS ALLEGED CO-CONSPIRATORS
    ARE STATUTORILY OBLIGATED TO DISCLOSE............................................24

    A.    CDP Has Informational Standing
          Solely By Virtue of Seeking Information ...........................................24

B.      CDP Has Informational Standing Based On
        Its Intended Uses of the Information It Seeks....................................................29

IV.    **CDP HAS ORGANIZATIONAL STANDING TO SEEK
        ENFORCEMENT OF FEDERAL CAMPAIGN FINANCE LAW** .........................**30**

V.     **CDP HAS PROCEDURAL STANDING TO COMPEL THE FEC TO
        ADJUDICATE ITS COMPLAINT WITHOUT UNLAWFUL DELAY**.................**32**

**CONCLUSION** .................................................................................................................**34**

# TABLE OF AUTHORITIES

## Cases

*Abigail Alliance for Better Access to Devel. Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ....................................................................................... 30

*Alliance for Democracy v. FEC*,
335 F. Supp. 39 (D.D.C. 2004) ...................................................................................... 29

*Alliance for Democracy v. FEC*,
362 F. Supp. 2d 138 (D.D.C. 2005) ............................................................................... 29

*ASPCA v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) ......................................................................................... 31

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015) ....................................................................................... 6

*Buchanan v. FEC*,
112 F. Supp. 2d 58 (D.D.C. 2000) ................................................................................. 25

*Campaign Legal Ctr. ("CLC") v. FEC*,
245 F. Supp. 3d 119 (D.D.C. 2017) ........................................................................... 3, 28

*Chamber of Commerce v. FEC*,
69 F.3d 600 (D.C. Cir. 1995) ........................................................................................ 19

*Citizens for Responsibility & Ethics in Wash. ("CREW") v. FEC*,
799 F. Supp. 2d 78 (D.D.C. 2011) ................................................................................. 29

*City of Waukesha v. EPA*,
320 F.3d 228 (D.C. Cir. 2003) .................................................................................. 12, 33

*Claybrook v. Slater*,
111 F.3d 904 (D.C. Cir. 1997) ...................................................................................... 11

*Common Cause v. FEC*,
108 F.3d 413 (D.C. Cir. 1997 ........................................................................................ 19

*CREW v. FEC*,
799 F. Supp. 2d 78 (D.D.C. 2011) ................................................................................. 27

*Ctr. for Law & Educ. v. Dep't of Educ.*,
396 F.3d 1152 (D.C. Cir. 2005) ..................................................................................... 33

*Cutler v. U.S. HHS*,
    797 F.3d 1173 (D.C. Cir. 2015) ................................................................ 12

*DSCC v. FEC*,
    Nos. 96-2184 & 96-0349 (JHG),
    1999 U.S. Dist. LEXIS 23375 (D.D.C. Oct. 18, 1999)........................ 22, 30, 34

*Elec. Privacy Info Ctr. v. Pres. Adv. Comm'n on Election Integrity*,
    266 F. Supp. 3d 297 (D.D.C. 2017) ....................................................... 14, 30

*Equal Rights Ctr. v. Post Props.*,
    633 F.3d 1136 (D.C. Cir. 2011) .................................................................. 31

*FEC v. Akins*,
    524 U.S. 11 (1998)....................................................................... 2, 14, 24

*FEC v. NRA Political Victory Fund*,
    6 F.3d 821 (D.C. Cir. 1993) ....................................................................... 16

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) (en banc) ...................................................... 33

*Fulani v. Brady*,
    935 F.2d 1324 (D.C. Cir. 1991) .................................................................. 23

*Gottlieb v. FEC*,
    143 F.3d 618 (D.C. Cir. 1998) ................................................................... 21

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982).................................................................................. 31

*Herbert v. Nat'l Academy of Scis.*,
    974 F.2d 192 (D.C. Cir. 1992) ................................................................... 12

*Herron v. FEC*,
    903 F. Supp. 2d 9 (D.D.C. 2012) ............................................................... 20

In re *Thornburgh*,
    869 F.2d 1503 (D.C. Cir. 1989) .................................................................. 12

*Int'l Ass'n of Machinists & Aerospace Workers v. FEC*,
    678 F.2d 1092 (D.C. Cir. 1982) (en banc) .............................................. 21, 22

*Jerome Stevens Pharms., Inc. v. FDA*,
    402 F.3d 1249 (D.C. Cir. 2005) .................................................................. 12

*Judicial Watch v. FEC,*
    180 F.3d 277 (D.C. Cir. 1999) ...................................................................... 24

*Judicial Watch, Inc. v. FEC,*
    293 F. Supp. 2d 41 (D.D.C. 2003) ............................................................... 29

*Kean for Congress Comm. v. FEC,*
    398 F. Supp. 2d 26 (D.D.C. 2005) ........................................................ 25, 29

*La. Energy & Power Auth. v. FERC,*
    141 F.3d 364 (D.C. Cir. 1998) ............................................................. 12, 23

*LaRoque v. Holder,*
    650 F.3d 777 (D.C. Cir. 2011) ...................................................................... 20

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ........................................................................... 11, 33

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ...................................................................... 15

*McConnell v. FEC,*
    540 U.S. 93 (2003) .................................................................................. 9, 20

*Nader v. FEC,*
    725 F.3d 226 (D.C. Cir. 2013) ............................................................. 18, 20

*Nat'l Treas. Empls. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) .................................................................... 31

*Natural Law Party of the United States v. FEC,*
    111 F. Supp. 2d 33 (D.D.C. 2000) ....................................................... 15, 19

*Raines v. Byrd,*
    521 U.S. 811 (1997) ..................................................................................... 13

*Rose v. FEC,*
    608 F. Supp. 1 (D.D.C. 1984) ...................................................................... 16

*Shays v. FEC,*
    337 F. Supp. 2d 28 (D.D.C. 2004) ........................................................ 18, 19

*Shays v. FEC,*
    414 F.3d 76 (D.C. Cir. 2005) ...................................................... 18, 19, 20

*Shays v. FEC*,
   528 F.3d 914 (D.C. Cir. 2008) .......................................................................... 25, 26, 27

*Sierra Club v. EPA*,
   129 F.3d 137 (D.C. Cir. 1997) ...................................................................................... 34

*Spokeo, Inc. v. Robbins*,
   136 S. Ct. 1540 (2016) ............................................................................ 13, 14, 15, 16

*United States v. Emor*,
   785 F.3d 671 (D.C. Cir. 2015) ...................................................................................... 12

*United States v. Marion*,
   404 U.S. 307 (1971) ........................................................................................................ 33

*United States v. O'Donnell*,
   608 F.3d 546 (9th Cir. 2010) ......................................................................................... 3

*Vroom v. FEC*,
   951 F. Supp. 2d 175 (D.D.C. 2013) ............................................................................ 29

*Vt. Agency of Nat'l Res. v. United States* ex rel. *Stevens*,
   529 U.S. 765 (2000) ........................................................................................................ 14

*Ward v. D.C. Dep't of Youth Rehab Servs.*,
   768 F. Supp. 2d 117 (D.D.C. 2011) .............................................................................. 6

*Wertheimer v. FEC*,
   268 F.3d 1070 (D.C. Cir. 2001) .................................................................................... 29

*Zivotofsky v. Sec'y of State*,
   444 F.3d 614 (D.C. Cir. 2006) ...................................................................................... 25

## Statutes and Regulations

52 U.S.C. § 30104 ............................................................................................... 2, 23, 35

52 U.S.C. § 30109 ....................................................................................................*passim*

52 U.S.C. § 30116 ............................................................................................... 1, 23, 26

52 U.S.C. § 30122 ............................................................................................... 3, 23, 26

11 C.F.R. § 102.17 ............................................................................................................... 2

11 C.F.R. § 110.4 ...................................................................................................... 3

11 C.F.R. § 110.6 ............................................................................................... 3, 26

11 C.F.R. § 111.4 ...................................................................................................... 4

11 C.F.R. § 111.5 ...................................................................................................... 4

11 C.F.R. § 111.6 ...................................................................................................... 4

11 C.F.R. § 111.9 ............................................................................................. 4, 5, 10

11 C.F.R. § 111.16 .................................................................................................... 5

11 C.F.R. § 111.17 ............................................................................................... 5, 10

11 C.F.R. § 111.18 ............................................................................................... 5, 10

11 C.F.R. § 111.19 ............................................................................................... 5, 10

FED. R. CIV. P. 10 ..................................................................................................... 6

FED. R. CIV. P. 12 ................................................................................................... 12

FED. R. CIV. P. 15 ................................................................................................... 34

Federal Election Campaign Act of 1971,
    Pub. L. No. 92-225, 86 Stat. 3 (Feb. 7, 1972) ................................................ 16

## Other Authorities and Sources

Donna Brazile, *Inside Hillary Clinton's Secret Takeover of the DNC*,
    POLITICO (Nov. 2, 2017), *at*
    https://www.politico.com/magazine/story/2017/11/
    02/clinton-brazile-hacks-2016-215774 ............................................................ 8

FEC, *Price Index Adjustments for Contribution and Expenditure
    Limitations and Lobbyist Bundling Disclosure Threshold*,
    80 FED. REG. 5,750 (Feb. 3, 2015) ................................................................... 1

H. Rpt. No. 94-1057 (Apr. 28, 1976) ..................................................................... 15

In re *Hillary Rodham Clinton for US Senate*
  *Exploratory Comm.*, Statement of Reasons,
  MUR 4960 (Dec. 21, 2000) ............................................................................................ 4

Kenneth P. Vogel & Isaac Arnsdorf,
  *Clinton Fundraising Leaves Little for State Parties*,
  Politico (May 2, 2016, 5:21 A.M.)
  https://www.politico.com/story/2016/04/
  clinton-fundraising-leaves-little-for-state-parties-222670 ................................................ 8

## INTRODUCTION

Plaintiff Committee to Defend the President ("CDP") filed this lawsuit based on Defendant Federal Election Commission's ("FEC") unexplained delay—now exceeding well over half a year—in making even an initial determination of whether the administrative complaint CDP filed with the FEC provides "reason to believe" federal campaign finance law had been violated. 52 U.S.C. § 30109(a)(2). Because CDP has standing to challenge the FEC's refusal to timely adjudicate its administrative complaint, *see* 52 U.S.C. § 30109(a)(8)(A), this Court should deny the FEC's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

## BACKGROUND

### A.   Federal Campaign Finance Law

The Federal Election Campaign Act "seeks to remedy any actual or perceived corruption of the political process through contribution and expenditure limitations as well as recordkeeping and disclosure requirements." *Citizens for Responsibility & Ethics in Wash. ("CREW") v. FEC*, 799 F. Supp. 2d 78, 80 (D.D.C. 2011).

**1.   Contribution Limits**—Federal law limits the amount a person may contribute to a political committee and, by extension, the amount a political committee may accept. In 2016, a person could contribute a total of up to $2,700 per election (adjusted for inflation) to a candidate or candidate committee, 52 U.S.C. § 30116(a)(1)(A); $10,000 to a state political party committee, *id*. § 30116(a)(1)(D); and $33,400 in unrestricted funds to the general treasury of a national political party committee, *id*. § 30116(a)(1)(B); *see* FEC, *Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold*, 80 FED. REG. 5,750, 5,752 (Feb. 3, 2015).

1

2.      **Reporting Requirements**—All political committees are required to file periodic, publicly accessible reports with the FEC disclosing their finances. Every political committee is required to disclose contributions it receives from any individual who contributes a total of more than $200 to it during a calendar year, 52 U.S.C. § 30104(b)(3)(A), or another political committee, *id*. § 30104(b)(3)(B)-(C), as well as any transfers it receives from affiliated committees, *id*. § 30104(b)(3)(D). A political committee is likewise required to disclose its disbursements, *id*. § 30104(b)(4), including transfers to affiliated committees, *id*. § 30104(b)(4)(C); political party committees are required to disclose transfers to any other political party committees. *Id*. § 30104(b)(4)(C). The Commission is required to make every statutorily required "statement, report, or notification" filed by a political committee "accessible to the public on the Internet" within 24 hours for electronic filings and 48 hours for paper filings. *Id*. § 30104(a)(11)(B). The Supreme Court has recognized this statutory scheme confers upon each member of the general public an individual, and individually enforceable, statutory right to receive and review accurate information from every political committee. *See FEC v. Akins*, 524 U.S. 11, 21 (1998).

3.      **Joint Fundraising Committees**—A joint fundraising committee ("JFC") is a political committee formed by two or more other political committees ("participants") to raise funds more easily. *See* 11 C.F.R. § 102.17(a). The participant committees enter into a written agreement containing a formula for allocating contributions to the JFC among them. *Id*. § 102.17(c)(1). The agreement must be provided to the FEC upon request, and the formula must appear in any fundraising solicitations from the JFC. *Id*. When a person contributes to a JFC, it is treated as a series of contributions from that person directly to each of the JFC's participants, in amounts determined by the allocation formula. *Id*. § 102.17(c)(6)(i). A person who contributes,

through a JFC, to its participants is bound by the same contribution limits that would apply if she contributed directly to those participants. *Id*. § 102.17(c)(4)(i). Thus, a JFC essentially acts as a pass-through entity, allowing a contributor to write a single check (to the JFC) to contribute to multiple different entities (the JFC's participants).

        **4.**        **Anticircumvention Provisions**—To prevent committees from circumventing these restrictions, depriving the public of the accurate information to which it is statutorily entitled, or disseminating misleading reports to the public, federal law imposes additional restrictions. *See Campaign Legal Ctr. ("CLC") v. FEC*, 245 F. Supp. 3d 119, 122-23 (D.D.C. 2017) (citing *United States v. O'Donnell*, 608 F.3d 546, 553 (9th Cir. 2010)).

        All contributions made by a person, "either directly or indirectly, on behalf of a particular candidate," including contributions earmarked for a candidate or "directed through an intermediary or conduit to such candidate," are deemed to be contributions directly from that person to the candidate. 52 U.S.C. § 30116(a)(8); *accord* 11 C.F.R. § 110.6(a). The intermediary must report both the "original source" and the "intended recipient" to the FEC. 52 U.S.C. § 30116(a)(8); *accord* 11 C.F.R. § 110.6(c)(1)(i)-(ii), (iv)(A)-(C). The recipient candidate must likewise report each intermediary or conduit who provides more than $200 in earmarked contributions in an election cycle. 11 C.F.R. § 110.6(c)(2)(i). A contribution is deemed "earmarked" if there is any "direct or indirect, express or implied, oral or written" designation or instruction which results in all or part of a contribution being transmitted to a certain candidate. 11 C.F.R. § 110.6(b)(1).

        Federal law also prohibits a person from "mak[ing] a contribution in the name of another person," "knowingly permit[ing] his name to be used to effect such a contribution," or "help[ing] or assist[ing]" such conduct. 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b)(1)(i)-(iii). A political

committee may not accept a contribution made in violation of these provisions. 52 U.S.C. § 30122; 11 C.F.R. § 110.4(b)(1)(iv).

### B.  Administrative Complaint Process

Federal law allows any person who believes a violation of campaign finance law has occurred to file an administrative complaint with the FEC. 52 U.S.C. § 30109(a)(1); 11 C.F.R. § 111.4(a). The complaint must be in writing, signed, sworn under penalty of perjury, and notarized; it may not be submitted anonymously. 52 U.S.C. § 30109(a)(1); 11 C.F.R. § 111.4(a)-(c). If the complaint satisfies all "technical requirements," the FEC must notify any person it alleges violated a relevant statute within five (5) days. 11 C.F.R. § 111.5(a)(1); 52 U.S.C. § 30109(a)(1). Such respondents have fifteen (15) days to file a response, explaining why "no action should be taken against [them]." 52 U.S.C. § 30109(a)(1); 11 C.F.R. § 111.6.

Based solely on the administrative complaint and any response, 11 C.F.R. § 111.9(a)—and **prior to performing an investigation**, *see id.* § 111.10(a)—the Commission must vote on whether there exists "reason to believe" any person has violated federal campaign finance law. 52 U.S.C. § 30109(a)(2); 11 C.F.R. § 111.9(a).[1] "Reason to believe" exists if a "complaint sets forth sufficient specific facts, which, if proven, true, would constitute a violation of the FECA." Comm'rs Mason, Sandstrom, Smith, and Thomas, In re *Hillary Rodham Clinton for US Senate Exploratory Comm.*, Statement of Reasons, MUR 4960, at 1 (Dec. 21, 2000). To meet this standard, an administrative complaint must either be based on "personal knowledge" or "identify a source of information that reasonably gives rise to a belief in the truth of the allegations presented." *Id.* Moreover, the allegations must be sufficiently "specific . . . so as to warrant a

---

[1] As demonstrated by the contrast between 52 U.S.C. § 30109(a)(2), requiring the FEC to make a "reason to believe" finding, and § 30109(a)(3), which requires it to later make a "probable cause" finding.

focused investigation that can prove or disprove the charge." *Id.* at 3. If four (4) Commissioners vote to make a reason-to-believe finding, the Commission must notify the respondents involved and then "make an investigation of such alleged violation, which may include a field investigation or audit." 52 U.S.C. § 30109(a)(2); 11 C.F.R. § 111.9(a).

After the investigation concludes, the FEC's General Counsel must prepare a brief advising the Commission whether "probable cause" exists to believe the respondents violated federal campaign finance law. 52 U.S.C. § 30109(a)(3); 11 C.F.R. § 111.16(a). Respondents are entitled to receive a copy of the brief and respond to it. 52 U.S.C. § 30109(a)(3); 11 C.F.R. § 111.16(b)-(c). With certain exceptions not relevant here, the Commission then votes on whether to accept the General Counsel's recommendation. 52 U.S.C. § 30109(a)(4)(A)(i). If four (4) Commissioners vote probable cause exists to believe campaign finance law has been violated, it must attempt to resolve the matter through conciliation with the respondents. 52 U.S.C. § 30109(a)(4)(A)(i); 11 C.F.R. §§ 111.17(a), 111.18(a). If conciliation fails, the General Counsel must then decide whether to recommend the Commission commence litigation in federal court. 11 C.F.R. § 111.19(a)-(b). "Upon recommendation of the General Counsel, the Commission may, by an affirmative vote of four (4) of its members, authorize the General Counsel" to sue the respondents in federal court. 11 C.F.R. § 111.19(b); *see also* 52 U.S.C. § 30109(a)(6)(A). The Commission may seek a civil penalty or injunction against the respondents. 52 U.S.C. § 30109(a)(6)(A).

If the Commission either dismissed an administrative complaint, or "fail[s] . . . to act" on a complaint within 120 days of its filing, any "aggrieved" party may sue in this Court. *Id.* § 30109(a)(8)(A). The Court may declare the Commission's dismissal or failure to act is "contrary to law" and "direct the Commission to conform with such declaration within 30 days." *Id.* § 30109(a)(8)(C). In the event the Commission fails to comply with this Court's order, "the

complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the [administrative] complaint." *Id.*

### C.    CDP's Administrative Complaint

On December 15, 2017, CDP filed an administrative complaint with the FEC. A true and complete copy of the administrative complaint is attached to the Complaint in this case as Exhibit 1. *See* Compl. ¶¶ 12, 14 & Exh. 1 (hereinafter, "Admin. Compl."). This court may therefore treat the administrative complaint as incorporated by reference into the Complaint and consider it when adjudicating the instant motion. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see, e.g.*, *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("Federal Rule of Civil Procedure 10(c) permits a plaintiff to attach an exhibit to the complaint, rendering the exhibit 'part of the pleading for all purposes.'"); *see also Ward v. D.C. Dep't of Youth Rehab Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011). "The Administrative Complaint was written, signed, notarized and verified under penalty of perjury as required by 52 U.S.C. § 30109(a)(1)." Compl. ¶ 13.

The administrative complaint arose from a series of what appear to be illegal transactions and inaccurate or incomplete FEC reports involving Hillary Victory Fund ("the Fund"), a joint fundraising committee ("JFC") comprised of the Democratic National Committee ("DNC"); Hillary for America, Hillary Clinton's authorized candidate committee ("Clinton Campaign"); and dozens of state Democratic party committees. Individuals made contributions sometimes totaling more than a half million dollars to the Fund. Based on the Fund's FEC filings, 538 people made contributions exceeding $100,000 each, and an additional 1,012 people made contributions of between $40,000 and $100,000. Mangini Decl. ¶ 7. From October 2015 through November 8, 2016 (Election Day), the Fund received a total of approximately $84 million in contributions. Admin.

Compl. ¶ 50. CDP does not know whether the Fund's contributors were assured most or all of their contributions to the Fund would be funneled to either the DNC or Clinton Campaign, or whether they were otherwise assured their substantial contributions to the Fund would be used to benefit Hillary Clinton. *Cf. id*. ¶ 116.

CDP also does not know what happened to the contributions the Fund received. According to many FEC reports, the Fund distributed funds it received to its participant committees, including the DNC, Clinton Campaign, and dozens of state party committees, virtually all of whom reported receiving the transfers the same day. Admin. Compl. ¶ 51. On virtually every such occasion, the very same day, every single state political party committee then purportedly independently decided to re-transfer all of the money it had just received from the Fund to the DNC; the funds were reportedly sent to, and received by, the DNC the same day (or, occasionally, the next day). *Id*. The administrative complaint was accompanied by a spreadsheet detailing over 400 instances where the Fund reportedly transferred funds to a state party, which reported receiving and immediately retransmitting them to the DNC. *See id*. ¶ 101; *see also id*. ¶¶ 58-100.

The administrative complaint alleged, "[E]very single disbursement [from the Fund] to a state party resulted in an immediate transfer of the same amount of funds from the state party to the DNC. Over 99% of funds transferred through [the Fund] to state parties wound up at the DNC." *Id*. ¶ 52. It further asserted, "The uniformity, regularity, magnitude, immediacy, and extent of these reported transfers—every single state party transferring every single disbursement it received from [the Fund], in its entirety, exclusively to the DNC, immediately upon receipt—unavoidably implies [the Fund]'s members had an understanding or agreement they would automatically funnel funds they received through [the Fund] to the DNC." *Id*. ¶ 53. Throughout this period, the DNC contributed funds to the Clinton Campaign, *id*. ¶¶ 104-05; made coordinated expenditures with the

Clinton Campaign, *id*. ¶ 107; and spent its money subject, illegally, to the direct control of the Clinton Campaign, *id*. ¶¶ 110-15. Former DNC Chair Donna Brazile confessed most state Democratic parties "funneled" money they reportedly received from the Fund "to the DNC, which quickly transferred the money to Brooklyn." Donna Brazile, *Inside Hillary Clinton's Secret Takeover of the DNC*, POLITICO (Nov. 2, 2017), *at*

https://www.politico.com/magazine/story/2017/11/02/clinton-brazile-hacks-2016-215774

CDP does not know, however, whether the contributions the Fund received were actually transferred through the participant state Democratic parties at all. On multiple occasions, the Fund reported transferring funds to state parties, and the DNC reported receiving funds from the state parties, but the state parties did not report either receiving them from the Fund or re-transferring them to the DNC. *Id*. ¶¶ 55, 56. As the Administrative Complaint explains, it is "reasonably possible the alleged transfers of [the Fund's revenues] to state parties never actually occurred, and all of the funds at issue were actually transferred directly from [the Fund] to the DNC, rendering all FEC reports concerning these alleged transactions fraudulent." *Id*. ¶ 56.

Even if the transfers did occur as reported, CDP does not know whether the state parties ever had custody or control of such funds, or instead whether the Fund and/or Clinton Campaign transferred funds, without the state parties' knowledge or permission, into and out of accounts opened in the state parties' names, thus never actually devolving custody or control of the funds to the state parties. *See id*. ¶ 56 (citing Kenneth P. Vogel & Isaac Arnsdorf, *Clinton Fundraising Leaves Little for State Parties*, POLITICO (May 2, 2016, 5:21 A.M.) ("While state party officials were made aware that Clinton's campaign would control the movement of the funds between participating committees, one operative who has relationships with multiple state parties said that some of their officials have complained that they weren't notified of the transfers into and out of

their accounts until after the fact."), *at* https://www.politico.com/story/2016/04/clinton-fundraising-leaves-little-for-state-parties-222670).

And CDP does not know whether the individuals reported as making contributions to the Fund were assured their money would wind up with the DNC and/or the Clinton Campaign. As the administrative complaint alleges, over 99% of the contributions the Fund reported receiving, totaling approximately $84 million, were ultimately funneled to the DNC and/or the Clinton Campaign. Admin. Compl. ¶ 52. If some or all of those contributors had been solicited with the assurance their five- and six-figure contributions to the Fund would go to the DNC and/or Clinton Campaign, *see id.* p. 9, ¶ 116, then those payments must be deemed contributions to the DNC and/or Clinton Campaign, and not the Fund or state Democratic parties, *see* 52 U.S.C. § 30116(a)(8); 11 C.F.R. § 110.6(b)(1); *cf. id.* § 30122.

The administrative complaint contained seven counts against the Fund and the DNC, their treasurers, the Clinton Campaign, and the state Democratic parties that participated in the Fund. Counts IV, V, and VII alleged the respondents filed false, inaccurate, and/or incomplete reports in violation of 52 U.S.C. § 30104 that deprived CDP of complete, accurate information to which CDP is statutorily entitled. Counts I and II allege the respondents violated anticircumvention measures, 52 U.S.C. § 30116(a)(8) (earmarking) and 52 U.S.C. § 30122 (contributions in the name of another), causing several of the reports to which CDP is statutorily entitled to be materially false, inaccurate, and/or incomplete. Finally, Counts III and VI allege violations of contribution limits that give the DNC an illegal advantage over CDP in raising hard money[2] to spend in connection with presidential elections.

---

[2] "Hard money" refers to funds that may be used for certain election-related purposes, such as political contributions, and must be raised subject to contribution limits. *See McConnell v. FEC*, 540 U.S. 93, 227 (2003).

### D.     CDP's Challenge to the FEC's Failure to Timely Adjudicate Its Complaint

The FEC was required to notify the respondents identified in CDP's administrative complaint within five (5) days of receiving it. *See* 52 U.S.C. § 30109(a)(1); Compl. ¶ 17. On or about December 21, 2017, the FEC acknowledged receiving the administrative complaint and the Enforcement Division of its Office of General Counsel assigned it Matter Under Review ("MUR") number 7302. Compl. ¶¶ 15-16. CDP alleges the FEC has not yet even voted on whether the administrative complaint, along with any responsive submission from the respondents, provides "reason to believe" one or more federal campaign finance statutes or regulations have been violated. *Id.* ¶ 17. Because the FEC has failed to take even this initial step nearly seven (7) months after the administrative complaint was filed, it cannot yet have commenced an investigation into the complaint's allegations, 52 U.S.C. § 30109(a)(2); 11 C.F.R. §§ 111.9(a), 111.10(a); determined whether probable cause exists to believe the respondents violated any campaign finance laws or regulations, 52 U.S.C. § 30109(a)(4)(A)(i); attempted to enter into a negotiated resolution with the respondents, *id.*; 11 C.F.R. §§ 111.17(a), 111.18(a); or decide whether to seek judicial relief, 52 U.S.C. § 30109(a)(6)(A); 11 C.F.R. § 111.19(b).

In short, more than 200 days after the administrative complaint was filed, the FEC quite literally has not yet even reached square one. The 2020 presidential campaign cycle will be well underway before the FEC even begins delving into whether the Democratic Party illegally funneled over $84 million dollars to the DNC and Clinton campaign during the previous presidential election and attempted to camouflage their money laundering scheme in an avalanche of fraudulent, incorrect, or otherwise illegal reports.

CDP challenges the FEC's unreasonable delay to enforce federal campaign finance law and obtain protection against future violations. The delay is even more inexplicable because CDP

provided a spreadsheet identifying, by page number, line number, and report, every reported step of every challenged transaction through which the $84 million was funneled to the DNC and Clinton Campaign. If the FEC determines "probable cause" exists the DNC or its alleged co-conspirators violated federal law, it may enter into a "conciliation agreement" with them "to correct or prevent such violation[s]" in the future, 52 U.S.C. § 30109(a)(4)(A)(i), and CDP would be entitled to review it, *id*. § 30109(a)(4)(B)(ii). In the event the FEC is unable to reach such a settlement, it may obtain an injunction prohibiting such future violations. *Id*. § 30109(a)(6)(A). Should the FEC instead choose to dismiss CDP's complaint rather than seeking such relief, CDP would have the right to seek a court order either compelling the FEC to do so, or authorizing CDP itself to seek injunctive and other relief directly against the DNC and the state Democratic parties. *Id*. § 30109(a)(8)(A), (C). The FEC's 200-plus-day delay in even making an initial threshold reason-to-believe determination precludes this process from even commencing.

## **ARGUMENT**

This Court should deny the FEC's Motion to Dismiss for Lack of Subject-Matter Jurisdiction. The FEC's only argument is that CDP lacks Article III standing to pursue the statutory cause of action, 52 U.S.C. § 30109(a)(8)(A), that Congress specifically created for litigants in CDP's position to challenge the FEC's failure to act on an administrative complaint within 120 days after its filing. Memorandum in Support of Defendant Federal Election Commission's Motion to Dismiss, D.E. #10, at 1 (June 22, 2018) (hereafter, "FEC Mem.").

To establish standing, CDP must show it has suffered or will suffer an "injury in fact," the injury is "fairly traceable" to the FEC's "challenged action," and a "favorable decision" is "likely" to "redress[]" the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The FEC challenges only CDP's injury-in-fact; it does not contest the causation or redressability elements

11

for standing. FEC Mem. at 1. CDP may demonstrate injury-in-fact by showing it has suffered a "concrete" and "particularized" injury as a result of the FEC's inordinate delay in taking action against respondents to compel their disclosure of truthful, accurate, complete reports and prevent them from exceeding contribution limits and violating anticircumvention restrictions in the 2020 presidential election. *Lujan*, 504 U.S. at 560-61. CDP easily satisfies this requirement in several independently sufficient ways.

For purposes of this motion to dismiss, this Court must assume the truth of CDP's allegations, *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005), and the merit of its claims, *Cutler v. U.S. HHS*, 797 F.3d 1173, 1179-80 (D.C. Cir. 2015) (holding that, at the motion to dismiss stage, the court "must assume that the party asserting federal jurisdiction is correct on the legal merits of his claim, 'that a decision on the merits would be favorable and that the requested relief would be granted'" (quoting In re *Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989)); *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). CDP need not show, at this stage, its underlying lawsuit will be successful or the FEC's delay actually is unlawful. *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 368 (D.C. Cir. 1998) ("A party need not prove that the agency action it attacks is unlawful, however, in order to have standing to level that attack."); *see also Claybrook v. Slater*, 111 F.3d 904, 907 (D.C. Cir. 1997).

Because the FEC moves to dismiss under Fed. R. Civ. P. 12(b)(1), this Court may consider not only the allegations in the Complaint, but other outside materials, as well, including the parties' representations. *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015) ("A district court deciding a motion to dismiss on jurisdictional grounds, such as standing, may consider evidence outside the complaint."); *see also Herbert v. Nat'l Academy of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (holding, in adjudicating a Rule 12(b)(1) motion, "the court may consider the complaint

supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts").

Part I explains that, under the Supreme Court's recent ruling in *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540 (2016), the FEC's delay in adjudicating CDP's administrative complaint itself constitutes a constitutionally cognizable injury under Article III. Part II demonstrates CDP has competitive standing to challenge the DNC and its alleged co-conspirators' past violations of campaign finance law and prevent them from continuing to violate the law during the 2020 presidential election cycle. The very reason for CDP's existence is to support President Donald J. Trump, and it is entitled to do so on a legally balanced playing field—both in 2016 and the forthcoming 2020 presidential election—without suffering a relative diminution of its message by illegal funds raised by the DNC, state Democratic parties, and other entities opposing Trump's candidacy.

Part III shows CDP has informational standing to challenge the FEC's delay because it is challenging the failure of the DNC and its alleged co-conspirators to truthfully, accurately, and completely provide all information to which CDP is statutorily entitled. Part IV establishes CDP has organizational standing to maintain this lawsuit, because the FEC's delay is impairing its ability to fund its desired public political communications and prevent it from exercising its statutory right to adjudicate the validity of the FEC's ultimate determination and, if necessary, pursue the DNC and its alleged co-conspirators itself. Finally, Part V confirms CDP has procedural standing to enforce the procedural rights 52 U.S.C. § 30109(a)(8) creates for it.

## I.   UNDER *SPOKEO, INC. V. ROBINS*, THE FEC'S DELAY ITSELF IS SUFFICIENT TO CONSTITUTE AN INJURY-IN-FACT TO CDP

CDP has standing to challenge the FEC's delay in adjudicating its administrative complaint under the Supreme Court's recent ruling in *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540 (2016). The

Court reaffirmed that, even when Congress creates a statutory cause of action such as 52 U.S.C. § 30109(a)(8)(A) and a plaintiff can state a valid claim, the plaintiff still must satisfy Article III's requirements for standing. *Id.* at 1547-48, 1549 ("'Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.' . . . Article III standing requires a concrete injury even in the context of a statutory violation." (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997))). *Spokeo* further reiterated the plaintiff's injury must be "actual or imminent," "concrete," and "particularized." *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).

Congress has constitutional power to "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* at 1549 (quoting *Lujan*, 504 U.S. at 578). Congress may create new statutory causes of action to redress injuries, even if they are not "tangible." *Id.* "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id.* A court must begin by "consider[ing] whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* (citing *Vt. Agency of Nat'l Res. v. United States* ex rel. *Stevens*, 529 U.S. 765, 775-77 (2000)). It must also defer to Congress' judgment, which the Court emphasized is "instructive and important," because "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Id.*

Even violations of an intangible, purely "procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact." *Id.* The Court declared, "[A] plaintiff in such a case *need not allege any additional harm* beyond the one Congress has identified." *Id.* (emphasis added) (citing *FEC v. Akins*, 524 U.S. 11, 20-25 (1998)); *accord Elec. Privacy Info. Ctr.*

14

*v. Pres. Adv. Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 309 (D.D.C. 2017). In this case, Congress created a statutory cause of action, *see* 52 U.S.C. § 30109(a)(8)(A), allowing a person to challenge the FEC's delay in adjudicating his or her administrative complaint as "contrary to law" after 120 days. *Id*. § 30109(a)(8)(C). The statute itself recognizes the FEC's unlawful delay in adjudicating a complaint may "aggrieve[]" the "party" that filed it. *Id*. § 30109(a)(8)(A).

Congress' decision to recognize unlawful delay in adjudicating administrative complaints as an actionable harm for the complainant is within Article III. First, plaintiffs have "traditionally" been permitted to seek relief "in English or American courts" against government entities that unlawfully refuse to fulfill their legally mandated responsibilities. *Spokeo*, 136 S. Ct. at 1549. As early as *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 168-69 (1803) (Marshall, C.J.), the Supreme Court—citing Blackstone and Lord Mansfield—recognized that, when a government official fails or refuses to perform a legally required act, a court may issue a writ of mandamus to compel performance. Section 30109(a)(8)(C) offers the same protection against governmental nonfeasance of (allegedly) legally required duties which English and American courts have traditionally granted.

Second, this court must defer to Congress' decision to designate the intangible harm resulting from the FEC's delay as "meet[ing] minimum Article III requirements." *Id*.; *see Natural Law Party of the United States v. FEC*, 111 F. Supp. 2d 33, 47 (D.D.C. 2000) (holding plaintiffs had standing to challenge FEC's dismissal of their administrative complaint in part because "FECA specifically authorizes any party aggrieved by a violation of its provisions to file a complaint with the FEC and to bring suit in federal court"). As the Conference Report to the Federal Election Campaign Act Amendments of 1976 attests, H. Rpt. No. 94-1057 (Apr. 28, 1976), the current statutory scheme reflects a compromise, *id*. at 49-50, between competing approaches

adopted by the House, *id*. at 49, and Senate, *id*. at 46, and overhauled an earlier system for judicial review directly in the circuit court, *see* Federal Election Campaign Act of 1971, Pub. L. No. 92-225, § 308(d)(1), 86 Stat. 3, 18 (Feb. 7, 1972). Particularly since the FEC is an independent commission insulated from the President's control, *see FEC v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993), this Court should defer to Congress' decision to allow a complainant to act as a "private attorneys general" to ensure timely consideration of its complaint, *Rose v. FEC*, 608 F. Supp. 1, 8 (D.D.C. 1984). Thus, "both history and the judgment of Congress," *Spokeo*, 136 S. Ct. at 1549, confirm a complainant such as CDP has Article III standing to invoke its statutory right under 52 U.S.C. § 30109(a)(8)(A) to challenge the FEC's unlawful delay in adjudicating its administrative complaint.

## II.     CDP HAS COMPETITIVE STANDING TO SEEK ENFORCEMENT OF FEDERAL CAMPAIGN FINANCE RESTRICTIONS AGAINST THE DNC AND ITS ALLEGED CO-CONSPIRATORS IN PRESIDENTIAL ELECTIONS

CDP has competitive standing to maintain its challenge to the FEC's alleged failure to timely adjudicate its administrative complaint. As its name implies, CDP's mission is to defend President Donald J. Trump and secure his re-election. Publicly available FEC filings confirm CDP spent over three million dollars and engaged in a wide range of activities during the 2016 presidential race to support Donald Trump's candidacy and oppose Hillary Clinton. Stop Hillary PAC, *Report of Receipts and Disbursements*, period 10/20/2016 – 11/20/2016, Page 4, Lines 24, 29 (June 5, 2017), *at* http://docquery.fec.gov/pdf/195/201706059055301195/201706059055301195.pdf (attached to Harvey Decl. as Exh. 1; *see* Harvey Decl. ¶ 13) (hereafter, "SHP Report"). Indeed, CDP's name during the 2016 presidential election cycle was "Stop Hillary PAC." *See* Committee to Defend the President, *Statement of Organization*, Page 5 (Jan. 28, 2017), *at*

http://docquery.fec.gov/pdf/619/201701289041532619/201701289041532619.pdf (attached to Harvey Decl. as Exh. 2; *see* Harvey Decl. ¶ 14).

Among other things, CDP (operating as Stop Hillary PAC) disseminated e-mails; ran radio, television, and Internet advertisements; engaged in litigation; maintained websites; mobilized volunteers, and engaged in numerous other activities in support of Trump's candidacy. *See* Harvey Decl. ¶ 7; *see also* SHP Report, Page 4, Lines 24, 29 (attached to Harvey Decl. as Exh. 1). It already has begun engaging in similar activities concerning the 2020 presidential election and will continue to do so. *See* Harvey Decl. ¶ 8; *see also* Committee to Defend the President, *Report of Receipts and Disbursements*, period 5/1/2018 – 5/31/2018, Page 4, Lines 24, 29 (June 20, 2018), *at* http://docquery.fec.gov/pdf/259/201806209113918259/201806209113918259.pdf (attached to Harvey Decl. as Exh. 3; *see* Harvey Decl. ¶ 15). President Trump already has filed his Statement of Candidacy for President in the 2020 election. *See* Donald J. Trump for President, Inc., *Miscellaneous Text (FEC Form 99)* (Jan. 20, 2017), *at* http://docquery.fec.gov/pdf/569/201701209041436569/201701209041436569.pdf.

CDP may assert competitive standing for three reasons. First, due to the FEC's failure to timely enforce federal law against the DNC, state Democratic parties, and their alleged co-conspirators, CDP faced not only an illegally structured electoral environment during the 2016 election cycle, but also the substantial likelihood of similar harm during the forthcoming 2020 election cycle. Second, the FEC's failure to timely enforce the law against the DNC, state Democratic parties, and their alleged co-conspirators has caused a relative diminution of CDP's voice supporting President Trump and opposing Hillary Clinton during the 2016 election cycle, and threatens to do so again during the next presidential election. Third, by failing to timely enforce the law against the DNC, state Democratic parties, and their alleged co-conspirators, the FEC

17

caused injury-in-fact to CDP by subjecting it to more onerous fundraising and reporting restrictions than its competitors.

### A.     CDP Suffered Injury From Having to Compete in an Illegally Structured Environment.

First, CDP has standing to challenge the FEC's allegedly illegal delay in adjudicating its administrative complaint because the FEC's failure to enforce federal campaign finance law causes CDP to face, and compete in, an illegally structured environment. This Court—in a ruling affirmed by the D.C. Circuit—has held a "participant[] in the federal campaign finance system" may challenge FEC decisions, including the agency's failure to act, that "shape the environment in which [that participant] must operate." *Shays v. FEC*, 337 F. Supp. 2d 28, 42, 44 (D.D.C. 2004), *aff'd* 414 F.3d 76, 85 (D.C. Cir. 2005) (affirming plaintiffs may challenge "illegal structuring of a competitive environment" as a result of the FEC's inactivity); *accord Nader v. FEC*, 725 F.3d 226, 228 (D.C. Cir. 2013) ("Injury from an 'illegally structured' competitive environment can give rise to competitor standing.").

The FEC's refusal to timely—if at all—enforce various campaign finance restrictions against the DNC, state Democratic parties, and other entities placed CDP at a competitive disadvantage in the 2016 presidential election and threatens to place it at a similar disadvantage in the 2020 presidential election. CDP's main goal, both in the 2016 and 2020 election cycles, is to secure the election of President Donald J. Trump. Harvey Decl. ¶ 5. Having raised and spent millions of dollars on an ongoing basis furthering these goals, it is a "participant[] in the federal campaign finance system." *Shays* 337 F. Supp. 2d at 42-43. As such, it has a concrete, particularized interest in ensuring "BCRA-compliant" presidential elections." *Shays*, 414 F.3d at 84.

18

CDP is harmed by "having to anticipate other actors" such as the DNC, state Democratic parties, and their alleged co-conspirators "engag[ing] in activities that otherwise would be barred" by the FEC. *Shays*, 337 F. Supp. 2d at 42. It is further harmed because it is, and will be, faced with opposing "groups seeking to evade contribution limits . . . and disclosure requirements imposed by Congress." *Shays*, 414 F.3d at 84. CDP "must anticipate and respond to a broader range of competitive tactics than federal law would otherwise allow" from the DNC, state Democratic parties, Democratic presidential campaigns, and their alleged co-conspirators. *Id*. at 86; *see also id*. at 90 (holding the "need to account for additional practices" by political competitors "supports Article III standing"). The competition CDP will face in pursuing its goals in the political system will be "intensified by BCRA-banned practices." *Id*. at 87. "By tolerating what the law condemn[s], the government caused [CDP's] injury." *Id*. at 93.

CDP may assert competitive standing to challenge the FEC's alleged failure to timely enforce federal campaign finance restrictions, despite the fact it is a political committee dedicated to supporting a particular presidential candidate, and not a candidate or candidate committee itself. *See Common Cause v. FEC*, 108 F.3d 413, 419 n.1 (D.C. Cir. 1997) (suggesting that, if the plaintiff, Common Cause, had not been a "'non-partisan' organization," it could have been a "political competitor" of the NRSC or Montana Republican Party); *see also Chamber of Commerce v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995) (holding that, if the FEC fails to take action against an organization such as the Chamber of Commerce for violating federal regulations, any "political competitor" of the Chamber's "could challenge the Commission's dismissal" of its complaint).

CDP has standing to seek to prevent the DNC, state Democratic parties, and their alleged co-conspirators from breaking campaign finance law without apparent legal impediment or

consequence in the 2020 presidential election cycle, even before those entities "seize" the opportunity and actually "disadvantage" CDP again. *Shays*, 414 F.3d at 90, 91. It is sufficient CDP demonstrate a "distinct risk" its "political rivals will exploit the challenged rules to [CDP's] disadvantage." *Id*. at 92 (quotation marks omitted); *Herron v. FEC*, 903 F. Supp. 2d 9, 17 (D.D.C. 2012) (holding the plaintiff could establish competitive standing by showing a "demonstrable probability that [it] will be subjected to an illegally structured campaign environment in the future"). Although the Supreme Court has declined to grant competitive standing to plaintiffs challenging illegal environments for elections "over four years away," *see Shays*, 414 F.3d at 92 (citing *McConnell v. FEC*, 540 U.S. 93, 224-26 (2003) (Rehnquist, C.J.), the D.C. Circuit has held plaintiffs had standing to bring such challenges for elections that were 19 months away, *LaRoque v. Holder*, 650 F.3d 777, 788 (D.C. Cir. 2011), and this Court has allowed plaintiffs to challenge FEC decisions likely to harm them in the next presidential election, *Nat'l Law Party of the United States v. FEC*, 111 F. Supp. 2d 33, 45 (D.D.C. 2000); *cf. Nader*, 725 F.3d at 229 ("Nader might have been able to establish standing as a competitor if he had shown that the FEC's determination injured his ability to fight the next election.").

In short, if the FEC continues refusing to take action on CDP's administrative complaint, and does not obtain a conciliation agreement, injunction, or other similar relief against similar violations of campaign finance law in the future, CDP faces a reasonable likelihood it will be forced to advocate for its preferred presidential candidate against the DNC, aided by state Democratic parties, and other alleged co-conspirators in an illegally structured environment.

**B.    CDP Suffered Injury Because the FEC is Allowing the DNC to Relatively Diminish CDP's Voice Concerning Presidential Elections.**

Independently, CDP has suffered injury from the FEC's refusal to timely adjudicate its administrative complaint because the DNC's allegedly illegal scheme gives the DNC an artificially

amplified voice—thereby relatively diminishing CDP's voice—concerning presidential elections. The D.C. Circuit has held a plaintiff may assert competitive standing to challenge a competitor's illegal actions that give the competitor a relatively greater voice in an election than the plaintiff. When a competitor's violations of campaign finance law allow it to engage in more election-related speech, the plaintiff's speech concerning that election is, by comparison, relatively diminished. *Int'l Ass'n of Machinists & Aerospace Workers v. FEC*, 678 F.2d 1092, 1098 (D.C. Cir. 1982) (en banc) (holding "plaintiffs have Article III standing" because they "allege that they suffer a relative diminution in their political voices—their influence in federal elections—as a direct result of the discriminatory imbalance Congress is alleged to have ordered in the 1976 FECA amendments"); *see also Gottlieb v. FEC*, 143 F.3d 618, 622 (D.C. Cir. 1998) (reiterating that competitive standing exists where the plaintiff's "influence has been diminished 'relative' to" certain PACs' influence); *cf. Natural Law Party*, 111 F. Supp. 2d at 45 (holding plaintiffs had standing because their exclusion from presidential debates "caused a 'relative diminution' of their political voices and an injury to their ability to influence the political process").

CDP's administrative complaint alleged the DNC funneled $84 million from the Fund, its joint fundraising committee, either directly or through state Democratic parties, back to the DNC itself. Admin Compl. ¶¶ 50-56. The DNC then contributed those funds to the Clinton Campaign, used them in coordination with the Clinton Campaign, and spent them subject to the direction and control of the Clinton Campaign to further Clinton's candidacy and oppose President Trump. *Id*. ¶¶ 104-16. The administrative complaint contends that, by funneling money through the Fund and, reportedly, dozens of state Democratic parties, the DNC and Clinton Campaign violated anticircumvention measures (Counts I and II) and received funds in excess of contribution limits, *id*. (Counts III and VI). Those illegally obtained hard-money funds allowed the DNC and Clinton

Campaign to participate to an improperly greater extent in the 2016 presidential election in support of Clinton's candidacy, thereby relatively diminishing CDP's voice in support of Trump. *See Gottlieb*, 143 F.3d at 621 (noting illegal transfers "directly infuse[d] the Clinton-Gore general election campaign with funds with which to influence public opinion in Clinton's favor"). If the FEC fails to enforce campaign finance law, or to obtain a conciliation agreement, injunction, or other measure to prevent such violations from continuing in the 2020 election, CDP will suffer continued "relative diminution" of its voice. *Int'l Ass'n of Machinists*, 678 F.2d at 1098; *Gottlieb*, 143 F.3d at 622. Thus, CDP has standing to challenge the FEC's unmitigated delay in adjudicating its administrative complaint.

### C.    CDP Suffered Injury Because, By Refusing to Enforce Campaign Finance Restrictions, the FEC Is Conferring Benefits on CDP's Competitors

Finally, CDP has competitive standing because, through its inordinate delay and inaction, the FEC is allowing the DNC and its alleged co-conspirators to violate federal laws, including contribution limits and reporting requirements, to which CDP is subject and by which it must abide. This Court has held a plaintiff may assert competitive standing when the government allows competitors to engage in illegal conduct which the plaintiff itself is barred from performing. In *DSCC v. FEC*, Nos. 96-2184 & 96-0349 (JHG), 1999 U.S. Dist. LEXIS 23375, at *11 (D.D.C. Oct. 18, 1999), this Court held the DSCC had standing to challenge the FEC's delay in adjudicating its administrative complaint. It explained, "[I]t is assumed that FEC has conferred a benefit on NRSC by failing to investigate and potentially seeking to punish NRSC's circumvention of its reporting obligations. That is a benefit that FEC also could confer on DSCC." *Id.* at 10. By refusing to investigate the NRSC for violating campaign finance laws to which the DSCC was subject, or otherwise taking timely action to prevent further violations by NRSC, the FEC had given it a competitive advantage over the DSCC which the DSCC had standing to challenge. *See also Fulani*

*v. Brady*, 935 F.2d 1324, 1328 (D.C. Cir. 1991) (holding a plaintiff may be able to assert competitive standing by showing the FEC is depriving it of an allegedly illegal "benefit that [the FEC] afforded to other similarly placed").

The same is true here. CDP's administrative complaint alleges the DNC and its alleged co-conspirators violated anticircumvention measures (Counts I and II), 52 U.S.C. §§ 30116(a)(8), 30122; reporting requirements, *id*. § 30104(b); and contribution limits, *id*. § 30116(a)(1). CDP prudently raised funds subject to BCRA's limits for its hard-money general account to fund activities in support of President Trump, properly disclosed all contributors and the amounts they contributed (and amended its filings when any inadvertent errors were discovered), and complied with other restrictions, such as earmarking requirements, 52 U.S.C. § 30116(a)(8) and prohibitions on contributions in the name of another, *id*. § 30122. Harvey Decl. ¶ 6. With regard to these statutory provisions, CDP is in the same position as the DNC; it has standing to complain about the FEC's tolerance of the DNC's alleged lawbreaking because it, too, is "in a position to receive" excessive contributions, contributions in the name of another, and contributions funneled through other PACs. *Gottlieb*, 143 F.3d at 621; *cf. La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) ("[P]arties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.").

In short, the FEC has failed to timely enforce federal contribution limits, reporting requirements, and anti-circumvention provisions against the DNC and its alleged co-conspirators. It has likewise failed to prevent such violations from continuing in the 2020 election. CDP is therefore at a competitive disadvantage relative to the DNC and its alleged co-conspirators in supporting and assisting its preferred candidate. CDP therefore has standing to challenge the FEC's inertness.

III.   **CDP HAS INFORMATIONAL STANDING TO SEEK ACCURATE INFORMATION THE DNC AND ITS ALLEGED CONSPIRATORS ARE STATUTORILY OBLIGATED TO DISCLOSE**

CDP has informational standing to request FEC adjudication of its administrative complaint because the complaint seeks information the DNC, state Democratic parties, and the Clinton campaign were statutorily required to disclose. Three of the counts in the administrative complaint expressly allege the respondents filed false, inaccurate, or incomplete reports. *See* Admin. Compl. ¶¶ 149 (Count IV), 153 (Count V; false reports); ¶ 162 (Count VII; inaccurate or incomplete reports). Two of the other counts in the administrative complaint, Count I, *id.* ¶ 130 (violations of earmarking provisions), and Count II, *id.* ¶ 138 (accepting contributions in the name of another), allege additional reporting violations stemming from violations of other substantive statutory requirements. *Cf. Judicial Watch v. FEC*, 180 F.3d 277, 278 (D.C. Cir. 1999) ("Nowhere in its administrative or civil complaint did Judicial Watch mention disclosure requirements or suggest that it desired documents that the alleged violators were required to disclose."). Article III allows CDP to challenge the FEC's delay in ensuring CDP receives the information to which it is entitled.

Section A demonstrates CDP may assert informational standing, regardless of its specific uses for the information at issue. Section B shows, in the alternative, CDP is entitled to seek that information because it intends to use it to develop its political strategies and further its political communications.

A.   **CDP Has Informational Standing Solely By Virtue of Seeking Information**

CDP may assert informational standing without regard to its uses for the information it seeks. "[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). CDP's

"injury in fact is the denial of information [it] believes the law entitles [it] to." *Shays v. FEC*, 528

F.3d 914, 923 (D.C. Cir. 2008); *accord Kean for Congress Comm. v. FEC*, 398 F. Supp. 2d 26, 36

(D.D.C. 2005) ("[T]he injury-in-fact [i]s the failure to obtain information that, by statute, [CDP]

has the right to have."); *see also Zivotofsky v. Sec'y of State*, 444 F.3d 614, 617-18 (D.C. Cir. 2006)

(holding a plaintiff denied information that federal law requires be disclosed "is injured-in-fact for

standing purposes because he does not get what the statute entitles him to receive"). CDP is not

required to show "an additional injury, beyond a statutory right to information, to establish

standing." *Kean for Congress Comm.*, 398 F. Supp. 2d at 36. Rather, CDP has been "harmed

simply by the FEC's purportedly unlawful failure to require" the DNC, Clinton Campaign, and

state Democratic parties report their financial transactions correctly. *Buchanan v. FEC*, 112 F.

Supp. 2d 58, 68 (D.D.C. 2000).

　　CDP has alleged it did not receive accurate and complete disclosures from the DNC and

other respondents as required by 52 U.S.C. § 30104(b). There are at least three main deficiencies

and omissions in the respondents' disclosures. ***First***, it is unclear from the respondents' public

FEC filings whether the Fund's purported contributors actually contributed to the Fund itself, as

the Fund reported, or instead engaged in transactions that qualify as contributions to the DNC

and/or Clinton Campaign. The Fund reported receiving more than 1,500 contributions, some

totaling hundreds of thousands of dollars, from individual contributors. *See* Mangini Decl. ¶ 7.

Over 99% of those contributions, totaling approximately $84 million, were ultimately funneled to

the DNC and/or the Clinton Campaign. Admin. Compl. ¶ 52. These circumstances provide reason

to believe some contributors may have been assured their five- and six-figure contributions to the

Fund would not simply be divvied up among dozens of state Democratic parties; rather,

contributors may have been guaranteed the full amount of their contributions would go to the DNC and/or Clinton Campaign. *See id*. p. 9, ¶ 116.

People who provided money to the Fund in response to such solicitations containing such assurances would have been actually making their contributions directly to the DNC and/or Clinton Campaign, *see* 52 U.S.C. § 30116(a)(8); 11 C.F.R. § 110.6(b)(1); *cf. id*. § 30122. Counts I, II, and IV point out neither the DNC nor Clinton Campaign reported any payments to the Fund as direct contributions to themselves. *Id*. ¶¶ 130, 138, 148-49. CDP has informational standing to know whether ostensible contributions to the Fund were actually contributions to the DNC and/or Clinton Campaign, which the DNC and/or Clinton Campaign were statutorily required to disclose as such, 52 U.S.C. §§ 30104(b)(3)(A), 30116(a)(8). *See Shays*, 528 F.3d at 923 (holding plaintiff had informational standing to challenge FEC regulations which allowed presidential candidates to report certain contributions they had received as expenditures, thereby precluding the public from learning the contributors' identities).

*Second,* it is unclear from the respondents' public FEC filings whether the state Democratic parties involved in the Fund had agreed in advance to act as "strawman" intermediaries, automatically shuttling virtually all payments they receive through the Fund to the DNC (which in turn would contribute those funds to the Clinton Campaign; make coordinated expenditures which the law treats as contributions to the Clinton Campaign, 52 U.S.C. § 30116(a)(7)(B)(i); or spend those funds subject to the Clinton Campaign's control, *see* Admin. Compl. p. 8, ¶¶ 50, 102-15. The administrative complaint alleges:

> The uniformity, regularity, magnitude, immediacy, and extent of these reported transfers—every single state party transferring every single disbursement it received from [the Fund], in its entirety, exclusively to the DNC, immediately upon receipt—unavoidable implies [the Fund's participants] had an understanding or agreement they would automatically funnel funds they received through [the Fund] to the DNC.

*Id.* ¶ 53; *see also id.* ¶¶ 125, 135, 141, 147, 152.

Had the state Democratic parties agreed to act as automatic conduits between the Fund and the DNC and/or Clinton Campaign, any money they received through the Fund would have to be reported as contributions to the DNC and/or Clinton Campaign, rather than the state parties themselves. *See* 52 U.S.C. § 30116(a)(8); 11 C.F.R. § 110.6(b)(1); *cf. id.* § 30122. Counts I, II, and IV point out the respondents generally reported payments to the Fund as being disbursed to the state Democratic parties, which in turn re-contributed them to the DNC; neither the DNC nor Clinton Campaign reported any disbursements to the state Democratic parties as direct contributions to themselves. *Id.* ¶¶ 130, 138, 148-49. CDP has informational standing to know whether money was actually disbursed from the Fund to state Democratic parties, which then repeatedly independently decided to make true contributions to the DNC and/or Clinton Campaign, or such disbursements were, in reality, transfers through "strawman" conduits directly to the DNC. 52 U.S.C. § 30104(b)(3)(B)-(D). *See Shays*, 528 F.3d at 923.

***Third***, and perhaps even more compellingly, it is unclear whether the reported transfers from the Fund to the state Democratic parties to the DNC even occurred, or if instead the Fund transferred its revenues directly to the DNC. Admin. Compl. ¶¶ 59, 61, 63, 65, 67, 68, 72, 75, 77, 79, 83, 86, 88, 90, 92, 94, 96, 99. ("It is reasonably possible [the Fund] never actually transferred funds to these or any other state parties on or about [the specific date], but rather transferred those funds directly to the DNC . . . ."); *see also id.* ¶ 153 (alleging the respondents filed false reports in violation of § 30104 if the Fund transferred its revenues directly to the DNC, rather than to the individual state Democratic parties).

The administrative complaint points out there are numerous occasions where the Fund reported transferring funds to a state Democratic party and the DNC reported receiving a transfer

from that party, but the alleged intermediary state Democratic party itself did not report either receiving any transfer from the Fund or making any transfer to the DNC. Disregarding state parties which have subsequently amended their reports, numerous such inconsistencies remain, including:

- Admin. Compl. ¶¶ 163(b), 164(b) ($24,000 involving the Utah Democratic Party);

- *id*. ¶¶ 165(b), 166(b) ($19,500 involving the Democratic Party of South Carolina);

- *id*. ¶¶ 165(c), 166(c) ($43,500 involving the Tennessee Democratic Party);

- *id*. ¶¶ 165(d), 166(d) ($19,500 involving the Utah Democratic Party);

- *id*. ¶¶ 167(b) ($20,600 involving the Massachusetts Democratic State Comm.);

- *id*. ¶¶ 169-70 ($100,000 involving the Idaho Democratic Party);

- *id*. ¶¶ 171-72 ($350,000 involving the WV State Democratic Executive Comm.);

- *id*. ¶¶ 173-74 ($300,000 involving the Mississippi Democratic Party);

- *id*. ¶¶ 175-76 ($900,000 involving the Kansas Democratic Party); and

- *id*. ¶¶ 179-84, 186-89, 190(b), 191(a), 192(c), 193(a) (a total of $1,176,000 involving the Arkansas Democratic Party).

It is literally impossible from these reports to tell which of the conflicting accounts of these transactions, totaling nearly $3 million, is accurate. Either the Fund's and DNC's reports are accurate, and these funds actually passed through state Democratic parties, or these state Democratic parties' reports are accurate, and the funds never passed through the state parties. Based on these conflicting reports, it is impossible for CDP to determine what actually happened, or which inconsistent account is accurate. The Fund, the DNC, and the state Democratic parties were statutorily required to file complete and accurate disclosures, and the CDP is statutorily entitled to know the truth. *See CLC*, 245 F. Supp. 3d at 127 (holding informational standing exists because the plaintiffs "espouse[d] a view of the law under which entities regulated by the

Commission are 'obligated to disclose certain information' that plaintiffs have not received but have a right to obtain" (quotation marks omitted)).

CDP may assert informational standing because it is seeking information the DNC and its alleged co-conspirators are required to disclose concerning the substance of their financial dealings. *Vroom v. FEC*, 951 F. Supp. 2d 175, 179 (D.D.C. 2013); *CREW v. FEC*, 799 F. Supp. 2d 78, 89 (D.D.C. 2011). The information at issue is not already in its possession, *cf. Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001); *Alliance for Democracy v. FEC*, 335 F. Supp. 39, 48 (D.D.C. 2004), and has not already been disclosed, *Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 147 (D.D.C. 2005). And CDP is not seeking simply a declaration by the FEC that their conduct was illegal. *Cf. Judicial Watch, Inc. v. FEC*, 293 F. Supp. 2d 41, 47 (D.D.C. 2003); *Wertheimer*, 268 F.3d at 1075. Thus, this Court should deny the motion to dismiss.

### B.    CDP Has Informational Standing Based On Its Intended Uses of the Information It Seeks

The FEC argues the Complaint should be dismissed because CDP has not shown it will use the information it seeks to determine how to cast its (non-existent) vote. *See* FEC Motion to Dismiss at 16-18 (arguing CDP "cannot show injury" because it "cannot vote" and "the complaint lacks any claim that CDP has members who vote"). The FEC did not mention this Court rejected precisely the same argument when the FEC raised it in *Kean for Congress Comm. v. FEC*, 398 F. Supp. 2d 26, 37 (D.D.C. 2005). In that case, the FEC maintained that, under *Akins*, "FECA disclosures are meant only for voters." *Id*. Rejected this meritless contention, this Court held *Akins* "does not lend itself to such a narrow construction." *Id*. It explained that not only voters, but "political committees, candidates, and candidate committees" are "intended to benefit from the FECA disclosure requirements." *Id*. at 38. FECA protects the right of political committees to

"us[e] information obtained as a result of FECA disclosure requirements" however, they wish, and a political committee such as CDP consequently has standing to enforce that right. *Id.*

Contrary to the FECs assertions, CDP need not seek the information under FECA specifically for voting-related purposes. "[T]he Supreme Court, and subsequent D.C. Circuit decisions, in making th[e] . . . inquiry into informational injury, have not directed district courts to conduct an exhaustive consideration of the possible uses of the requested information and an examination of support in the record for those asserted uses." *Id.* at 34-35. Rather, the only inquiry is whether the information sought would "help" the plaintiff in some way. *Id.* at 35 (quoting *Akins*, 524 U.S. at 21); *see also DSCC*, 1999 U.S. Dist. LEXIS 23375, at *12-13 (holding the plaintiff had established informational standing because "she would put th[e] information to use"); *cf. Elec. Privacy Info Ctr.*, 266 F. Supp. 3d at 310 (holding the plaintiff had informational standing because it "uses information it obtains from the government to carry out its mission to educate the public regarding privacy issues"). Here, CDP already has spent in excess of one hundred thousand dollars disseminating information to the public about the Democrats' scheme. Harvey Decl. ¶ 9. It wishes to use the information it obtains from corrected, completed, and updated reports to enhance the accuracy, specificity, and utility of its public communications. *Id.* ¶ 11. These are the types of "campaign-finance related activities . . . where the sought-after information would likely prove useful." *CLC*, 245 F. Supp. 3d at 127. Thus, CDP has informational standing to maintain this lawsuit.

## IV.   CDP HAS ORGANIZATIONAL STANDING TO SEEK ENFORCEMENT OF FEDERAL CAMPAIGN FINANCE LAW

CDP has organizational standing to challenge the FEC's allegedly illegal refusal to timely adjudicate its administrative complaint. Article III recognizes organizational standing "in a wide range of circumstances." *Abigail Alliance for Better Access to Devel. Drugs v. Eschenbach*, 469

F.3d 129, 133 (D.C. Cir. 2006). A plaintiff may establish organizational standing by demonstrating the defendant caused "concrete and demonstrable injury to [its] activities" by leading the plaintiff to "drain [its] . . . resources," rather than "simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The D.C. Circuit has elaborated that a plaintiff must show a "direct conflict between the defendant's conduct and the organization's mission," *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Nat'l Treas. Empls. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)), and the defendant's conduct must have made "the organization's activities more difficult," *Nat'l Treas. Empls. Union*, 101 F.3d at 1430.

Here, the FEC's refusal to act undermines CDP's organizational interests. CDP's main mission is to generate support for the presidency and candidacy of Donald Trump, in part by exposing Democrats' dishonesty and persistent and pervasive illegal conduct. Harvey Decl. ¶ 4. By refusing to even initiate an investigation into the alleged conspiracy to violate campaign finance laws among the DNC, dozens of state Democratic parties, and a Democratic presidential candidate, the FEC is undermining CDP's mission by allowing the DNC to raise essentially unlimited hard-money funds in support of its presidential candidates and to oppose President Trump. Independently, the FEC is hindering CDP's mission by causing CDP to devote additional resources to educating the public about the illegality of schemes such as the DNC's.

The D.C. Circuit has recognized a defendant's allegedly illegal conduct causes injury-in-fact where an organizational plaintiff chooses to respond by diverting resources from its other programmatic efforts or increasing its public education efforts. *See, e.g.*, *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (holding a defendant's conduct causes injury-in-fact where it leads the plaintiff organization to voluntarily choose to "increase[] the resources [it] . . .

devote[s] to programs independent of its suit"). Here, the FEC's allegedly illegal delay in addressing the DNC's illegal conduct has caused CDP to redirect its resources. CDP has chosen to respond to the FEC's inexplicable inaction by spending hundreds of thousands of dollars to both publicize the DNC's conduct and educate the public about the illegality of such schemes, to correct misimpressions the funneling of $84 million from hundreds of contributors over more than a year may cause. Harvey Decl. ¶¶ 9-10.

If the FEC complies with federal law and adjudicated CDP's administrative complaint in a timely manner, CDP could avoid spending additional resources on such public communications. If the FEC votes to dismiss the administrative complaint and a court upholds that determination, the matter would be resolved and further public communications about the illegality of the DNC's conduct (and any similar schemes) unnecessary. If the FEC instead properly takes action against the DNC or its alleged co-conspirators, it would be a matter of public record and a highly newsworthy development. *Cf.* 52 U.S.C. § 30109(a)(4)(B)(i)-(ii), (a)(6)(A), (a)(12)(A) (requiring FEC to maintain confidentiality of administrative complaints unless it entered into a conciliation agreement or files a lawsuit against the respondents). In either case, CDP would be able to redirect resources from educating the public—both about the fact the DNC engaged in such illegal conduct, and that such schemes are prohibited by federal law despite the Democratic party's decision to engage in them—to other means of achieving its programmatic goals. Harvey Decl. ¶ 12. Thus, CDP has organizational standing to challenge the FEC's allegedly illegal delay.

## V.     CDP HAS PROCEDURAL STANDING TO COMPEL THE FEC TO ADJUDICATE ITS COMPLAINT WITHOUT UNLAWFUL DELAY

Finally, CDP has procedural standing to challenge the FEC's refusal to enforce the statutory procedural protections 52 U.S.C. § 30109(a)(8) affords it. A plaintiff has Article III standing to "enforce procedural rights . . . so long as the procedures in question are designed to

protect some threatened concrete interest of his." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n.8 (1992); *accord City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003). The plaintiff may assert that procedural right "without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. The D.C. Circuit, sitting *en banc*, elaborated that a "procedural-rights plaintiff" may demonstrate procedural standing by showing two things: (i) "the defendant's acts omitted some procedural requirement," and (ii) "it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664-65 (D.C. Cir. 1996) (en banc); *accord Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005).

CDP satisfies both of *Florida Audubon Society's* requirements for procedural standing. First, CDP has alleged the FEC has unlawfully delayed in adjudicating its administrative complaint. Section 30109(a)(8) requires the FEC to resolve administrative complaints without delays that are "contrary to law," *id.* § 30109(a)(8)(C), and allows the complainant to sue to enforce that right after 120 days, *id.* § 30109(a)(8)(A). Second, this requirement for timely adjudication of administrative complaints protects a complainant's right to be able to effectively enforce federal law itself, in the event the FEC unlawfully persists in refusing to do so. *Id.* § 30109(a)(8)(C) (holding if the FEC fails to pursue an administrative complaint after a court has declared its actions unlawful, "the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint"). By its very nature, delay erodes the ability of a government or plaintiff such as CDP to be able to prove its case. *See United States v. Marion*, 404 U.S. 307, 325-26 (1971) (discussing "the real possibility of prejudice inherent in any extended delay: the memories will dim, witnesses become inaccessible, and evidence be lost"). Moreover, timely adjudication of CDP's complaint would more quickly ensure protection from

illegally funded competition by the DNC and its alleged co-conspirators. *See Sierra Club v. EPA*, 129 F.3d 137, 139 (D.C. Cir. 1997) (holding plaintiff had procedural standing to challenge delay). Finally, timely adjudication is necessary because federal law requires political committees to retain their records for only three years. 52 U.S.C. § 30102(d). A lengthy delay increases the likelihood that the DNC and state Democratic parties will destroy the evidence necessary to both determine the truth about their filings and confirm their wrongdoing.

Thus, CDP has procedural standing to maintain this lawsuit.

## CONCLUSION

CDP "is entitled to an answer" from the FEC concerning its administrative complaint "sooner rather than later." *DSCC*, 1999 U.S. Dist. LEXIS 23375, at *14. For these reasons, CDP respectfully requests this Court deny FEC's motion to dismiss with prejudice. In the alternative, CDP seeks leave to amend its complaint as necessary to remedy jurisdictional concerns. FED. R. CIV. P. 15(a)(2).

Respectfully submitted,

  /s/ Dan Backer_____
    Dan Backer
    POLITICAL.LAW PLLC
    441 N. Lee Street, Suite 300
    Alexandria, VA 22314
    (202) 210-5431
    dan@political.law
    *Counsel for Plaintiff Committee*
    *to Defend the President*