**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COMMITTEE TO DEFEND THE PRESIDENT, | ) ) ) ) | |
| Plaintiff, | ) ) | Civ. No. 18-888 (RDM) |
| v. | ) ) | |
| FEDERAL ELECTION COMMISSION, | ) ) | REPLY IN SUPPORT OF MOTION TO DISMISS |
| Defendant. | ) ) | |

**REPLY IN SUPPORT OF DEFENDANT**
**FEDERAL ELECTION COMMISSION'S MOTION TO DISMISS**

Lisa J. Stevenson (D.C. Bar No. 457628)
Acting General Counsel
lstevenson@fec.gov

Kevin Deeley
Associate General Counsel
kdeeley@fec.gov

Harry J. Summers
Assistant General Counsel
hsummers@fec.gov

Seth Nesin
Attorney
snesin@fec.gov

FEDERAL ELECTION COMMISSION
1050 First Street NE
Washington, DC 20463
(202) 694-1650

July 27, 2018

# TABLE OF CONTENTS

*Page*

I.   THE MERE EXISTENCE OF SECTION 30109(a)(8)(A) DOES NOT AUTOMATICALLY CONFER ARTICLE III STANDING ON ALL ADMINISTRATIVE COMPLAINANTS ................................................................. 2

II.   CDP LACKS COMPETITIVE STANDING BECAUSE IT DOES NOT COMPETE WITH THE ADMINISTRATIVE RESPONDENTS AND MERELY SPECULATES THAT PURPORTED WRONGDOING WILL REOCCUR ................................................................................................................. 6

    A.   CDP Is Not a Competitor of Any of the Administrative Respondents ............. 7

    B.   CDP Merely Speculates that the Alleged Conduct of Certain Persons in 2016 Indicates That It Will Be Forced to Participate in an Illegally Structured Environment in 2020 ..................................................................... 10

III.   CDP LACKS INFORMATIONAL STANDING BECAUSE IT MERELY SEEKS DETERMINATIONS ABOUT THE LEGALITY OF ALLEGED CONDUCT THAT HAS ALREADY BEEN REPORTED ........................................ 13

IV.   CDP LACKS ORGANIZATIONAL STANDING BECAUSE IT DID NOT DIVERT RESOURCES AS A RESULT OF ALLEGED VIOLATIONS BY RESPONDENTS ....................................................................................................... 17

V.   CDP DOES NOT HAVE A RIGHT TO AN FEC INVESTIGATION ON A PARTICULAR TIME FRAME AND LACKS PROCEDURAL STANDING .......... 19

VI.   CONCLUSION ......................................................................................................... 21

# TABLE OF AUTHORITIES

*Cases*                                                                    *Page(s)*

*All. for Democracy v. FEC*, 335 F. Supp. 2d 39 (D.D.C. 2004)..........................................5, 16

*Buchanan v. FEC*, 112 F. Supp. 2d 58 (D.D.C. 2000) ............................................................7

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................................8

*Campaign Legal Ctr. v. FEC*, 245 F. Supp. 3d 119 (D.D.C. 2017)...................................16, 17

*Chamber of Commerce of the U.S. v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) ..............................9

*Common Cause v. FEC*, 108 F.3d 413 (D.C. Cir. 1997) ....................4, 5, 9, 13, 14, 16, 17, 18

*Citizens for Responsibility and Ethics in Wash. v. FEC*,
    475 F.3d 337 (D.C. Cir. 2007) ................................................................................ 15-16

*Citizens for Responsibility and Ethics in Wash. v. FEC*,
    267 F. Supp. 3d 50 (D.D.C. 2017) .............................................................................5, 17

*Citizens for Responsibility and Ethics in Wash. v. FEC*,
    401 F. Supp. 2d 115 (D.D.C. 2005) ..............................................................................16

*Citizens for Responsibility and Ethics in Wash. v.*
    *U.S. Dep't of the Treasury, IRS*, 21 F. Supp. 3d 25 (D.D.C. 2014)..................................13

*DeFunis v. Odegaard,* 416 U.S. 312 (1974) ...........................................................................11

*FEC v. Akins*, 524 U.S. 11 (1998)..................................................................................14, 16

*FEC v. Rose*, 806 F.2d 1081 (D.C. Cir. 1986).........................................................................6

*Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) .........................................19

*Fulani v. Brady*, 935 F.2d 1324 (D.C. Cir. 1991)...............................................................7, 10

*Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979) ..................................................3

*Gottlieb v. FEC*, 143 F.3d 618 (D.C. Cir. 1998).............................................................7, 8, 10

*Hassan v. FEC*, 893 F. Supp. 2d 248 (D.D.C. 2012),
  *aff'd*, *Hassan v. FEC*, No. 12-5335, 2013 WL 1164506 (D.C. Cir. Mar. 11, 2013)..........7, 8

*Herron for Cong. v. FEC*, 903 F. Supp. 2d 9 (D.D.C. 2012)..............................................11, 12

*In re Nat'l Cong. Club v. FEC*, Nos. 84-5701, 84-5719,
  1984 WL 148396 (D.C. Cir. Oct. 24, 1984) .........................................................................5-6

*Int'l Ass'n of Machinists & Aerospace Workers v. FEC*,
  678 F.2d 1092 (D.C. Cir. 1982).......................................................................................9, 13

*Judicial Watch, Inc. v. FEC*, 293 F. Supp. 2d 41 (D.D.C. 2003) ..........................................4, 5

*Kean for Cong. Comm. v. FEC*, 398 F. Supp. 2d 26 (D.D.C. 2005) ......................................16

*LaRoque v. Holder*, 650 F.3d 777 (D.C. Cir. 2011) ............................................................6, 7

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)..............................................................3

*Nader v. FEC*, 725 F.3d 226 (D.C. Cir. 2013).................................................................10, 11

*Nat. Law Party of the U.S. v. FEC*, 111 F. Supp. 2d 33 (D.D.C. 2000) ...................................4

*Perot v. FEC*, 97 F.3d 553 (D.C. Cir. 1996)........................................................................6

*Pharmachemie B.V. v. Barr Labs. Inc.*, 276 F.3d 627 (D.C. Cir. 2002)................................12

*Raines v. Byrd*, 521 U.S. 811 (1997) .................................................................................3

*Robins v. Spokeo, Inc.*, 742 F.3d 409 (9th Cir. 2014)..............................................................2

*Shays v. FEC*, 414 F.3d 76 (D.C. Cir. 2005) ...................................................................6, 7

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ...........................................................2, 3, 4

*Stockman v. FEC*, 138 F.3d 144 (5th Cir. 1998)...................................................................6

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) .........................................................2, 3

*United States v. Lee*, 106 U.S. 196 (1882)...........................................................................4

**Statutes and Regulations**

18 U.S.C. § 1519........................................................................................................20

52 U.S.C. § 30102(d) ..................................................................................................20

52 U.S.C. § 30109(a)(8)............................................................................................1, 5, 6, 16

52 U.S.C. § 30109(a)(8)(A) ....................................................................................2, 4, 5, 19

52 U.S.C. § 30109(a)(12)......................................................................................................20

52 U.S.C. § 30116(a)(8)........................................................................................................15

11 C.F.R. § 106.6(a)................................................................................................................8

11 C.F.R. § 110.6(b)(1)..........................................................................................................15

**_Miscellaneous_**

Fed. R. Civ. P. 15(a)(2)..........................................................................................................21

LCvR 15.1................................................................................................................................21

Plaintiff Committee to Defend the President ("CDP") relies on many theories in an effort to show it has Article III standing, but CDP's kitchen-sink approach cannot obscure the fact that it suffers no concrete and particular injury from the conduct about which it complains.  CDP first asserts that it has been injured simply by having filed an administrative complaint that defendant Federal Election Commission ("Commission" or "FEC") has not acted on as quickly as CDP wants.  But there is no precedent to support that novel view of constitutional standing under 52 U.S.C. § 30109(a)(8).  CDP then claims it has been injured because it is a competitor in a political environment tainted by the FEC's alleged failure to adequately enforce the law.  But CDP does not compete with any of the administrative respondents — it is not a candidate or political party.  In any case, the notion that CDP will be harmed in the future by the type of joint fundraising conduct about which it complains, allegedly directed by the 2016 presidential campaign of Hillary Clinton, is speculative at best.  CDP also states that it has been deprived of information to which it is legally entitled, but it fails to show it actually lacks any information that is legally required to be reported to the FEC, as opposed to simply lacking a declaration from the FEC that respondents have violated the law, which is insufficient to support standing. CDP claims that its organizational mission has been hindered, but its discretionary spending to publicize this matter is not a cognizable injury.  And CDP asserts that it has been harmed by a failure of the FEC to follow the agency's enforcement procedure, but CDP fails to meet its burden to show how any alleged agency delay would present an appreciable risk to a particularized interest of CDP.  In short, none of CDP's disparate theories establishes that it has suffered an injury-in-fact as required to show Article III standing under the applicable case law. The Court should dismiss this case for lack of subject matter jurisdiction.

I.    **THE MERE EXISTENCE OF SECTION 30109(a)(8)(A) DOES NOT
      AUTOMATICALLY CONFER ARTICLE III STANDING ON ALL
      ADMINISTRATIVE COMPLAINANTS**

As the FEC explained, Article III standing is a constitutional requirement that cannot be

altered by Congress.  (Mem. in Supp. of Def. FEC's Mot. to Dismiss ("FEC Br.") (Docket No.

10) at 8-9 (citing *Summers v. Earth Island Inst.,* 555 U.S. 488, 497 (2009) and *Spokeo, Inc. v.

Robins,* 136 S. Ct. 1540, 1549 (2016)).)  CDP does not contest this point as a general matter, but

it argues that this case falls within a narrow exception described in *Spokeo* for a plaintiff that

suffers the "intangible harm" of being deprived of a "procedural right" that has been created by

Congress.  136 S. Ct. at 1549; *see* Pl. Comm. to Def. the President's Mem. in Opp. to Mot. to

Dismiss ("CDP Opp.") (Docket No. 14) at 14.  According to CDP, simply by virtue of having

complained to the FEC that others were violating the Federal Election Campaign Act ("FECA"),

"a complainant such as CDP has Article III standing to invoke its statutory right under 52 U.S.C.

§ 30109(a)(8)(A) to challenge the FEC's unlawful delay in adjudicating its administrative

complaint."  (CDP Opp. at 16.)  However, this permissive view of standing is inconsistent with

both the reasoning and holding in *Spokeo* and later cases.  CDP has failed to identify any support

for its proposition that Article III standing is automatically conferred upon any administrative

complainant that brings suit pursuant to 52 U.S.C. § 30109(a)(8)(A).

In *Spokeo*, the plaintiff sued an online search engine that allegedly provided inaccurate

information about him in violation of the Fair Credit Reporting Act.  136 S. Ct. at 1544.  A panel

of the Ninth Circuit Court of Appeals held that the plaintiff had standing at least in part because

"the violation of a statutory right is usually a sufficient injury in fact to confer standing."  *Robins

v. Spokeo, Inc.*, 742 F.3d 409, 412 (9th Cir. 2014).  But the Supreme Court reversed and

remanded, pointing to its own previous holdings that "Congress cannot erase Article III's

standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo*, 136 S. Ct. 1547-48 (quoting *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) and citing *Summers*, 555 U.S. at 497 and *Gladstone, Realtors v. Vill. of Bellwood,* 441 U.S. 91, 100 (1979)).  The *Spokeo* majority did discuss a unique circumstance in which Congress's actions could indirectly expand the scope of Article III standing.  Because even "intangible injuries" can be sufficiently concrete to support standing, "the violation of a procedural right granted by statute can be sufficient in some circumstances [to create Article III standing]." *Spokeo*, 136 S. Ct. 1549.  The Court cautioned, however, that this exception "does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right"; a plaintiff "could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.*

To qualify for this exception, CDP must establish that its "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," *Spokeo*, 136 S. Ct. at 1549, but CDP fails to do so.  CDP cites only *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 168-69 (1803), arguing that that landmark case also involved an allegation about "government entities that unlawfully refuse to fulfill their legally mandated responsibilities" (CDP Opp. at 15).  But CDP can show at most a superficial similarity to *Marbury*, not the " close relationship" to a harm that *Spokeo* requires.  136 S. Ct. at 1549.  William Marbury's harm was tangible, concrete, and personal — he had been appointed to be a Justice of the Peace by President John Adams in the closing days of the Adams administration, but he was denied that commission by James Madison, the Secretary of State under President Jefferson.  *Marbury*, 5 U.S. at 137.  That harm bears no similarity to the alleged

3

harm to an administrative complainant who is displeased that the FEC is not acting quickly enough in enforcing a campaign finance statute against a third party.  Perhaps CDP could not point to any common law cases involving a similar harm because none exist — the doctrine of sovereign immunity, which was "derived from the laws and practices of our English ancestors," traditionally prevented virtually all suits against the government for its actions or lack thereof. *United States v. Lee*, 106 U.S. 196, 205–06 (1882).

This Court can also rely on any Congressional guidance to determine whether the denial of an alleged procedural right is sufficient to convey standing, *Spokeo*, 136 S. Ct. at 1549 (courts should consider whether Congress identified the injury as one of the "intangible harms that meet minimum Article III requirements"), but that does not help CDP here either.  Congress's passage of 52 U.S.C. § 30109(a)(8)(A) does not itself create standing for those that sue under the provision; rather, it "confers a right to sue upon parties *who otherwise already have standing*." *Judicial Watch, Inc. v. FEC*, 293 F. Supp. 2d 41, 48 (D.D.C. 2003) (quoting *Common Cause v. FEC*, 108 F.3d 413, 419 (D.C. Cir. 1997)) (emphasis added by *Judicial Watch*).  After all, the *Spokeo* majority opinion reversed a holding that the plaintiff had standing, even though he had sued under a provision of law that Congress created specifically authorizing such suits.  136 S. Ct. at 1549.  Congress would need to provide some other indication that it intended the law to create a procedural right, and CDP points to no such authority.  CDP cites *Natural Law Party of the United States v. FEC*, 111 F. Supp. 2d 33 (D.D.C. 2000) (*see* CDP Opp. at 15), but that case did not find that Congress intended to create Article III standing for all administrative complainants under 52 U.S.C. § 30109(a)(8)(A).  Rather, the court stated that "plaintiffs have a legal basis for asserting standing *based on their political competitor status*," *Natural Law Party*, 111 F. Supp. 2d at 47 (emphasis added), which is not available here for the reasons explained

below.  *See infra* Section II.  CDP also cites some legislative history about section 30109(a)(8) (CDP Opp. at 15-16), but that history contains no suggestion that Congress intended to create a procedural right the denial of which would satisfy Article III standing.

Lastly, CDP seems to suggest that use of the word "aggrieved" in 52 U.S.C. § 30109(a)(8)(A) means that Congress intended to create a procedural right to support standing, but the FEC pointed to several cases in which a plaintiff lacked standing despite having a grievance about the FEC's handling of its administrative complaint.  (FEC Br. at 9-12 (citing, among other cases, *Common Cause*, 108 F.3d 413; *Judicial Watch,* 293 F. Supp. 2d 41; and *All. for Democracy v. FEC*, 335 F. Supp. 2d 39 (D.D.C. 2004)).)[1]  Although CDP also cites these cases (CDP Opp. at 19, 29), it makes no attempt to reconcile their outcome with its desired outcome in this case.  CDP may believe that *Spokeo* altered the legal landscape, but courts have continued to dismiss cases brought by administrative complainants under 52 U.S.C. § 30109(a)(8) for lack of standing after *Spokeo*.  *See, e.g., CREW v. FEC*, 267 F. Supp. 3d 50, 55 (D.D.C. 2017).

FECA's structure also shows that Congress did not intend to create a procedural right that confers standing on all administrative complainants alleging delay.  Contrary to CDP's suggestions (*see*, *e.g.*, CDP Opp. at 10-11), FECA contains no provision imposing on the Commission any set time period in which to take any specific steps or to complete the processing of an administrative complaint.  On the contrary, the D.C. Circuit summarily reversed another district court's application of a presumption that the agency was required to address such matters even within a two-year federal election cycle.  *See In re Nat'l Cong. Club*, Nos. 84-5701, 84-

---

[1]     Some of these cases involve the Commission's dismissal of an administrative complaint, rather than an allegation of delay, but 52 U.S.C. § 30109(a)(8)(A) authorizes both types of actions and the statute uses the word "aggrieved" to refer to plaintiffs of both types.

5719, 1984 WL 148396, at *1 (D.C. Cir. Oct. 24, 1984) (per curiam); *accord Perot v. FEC*, 97

F.3d 553, 559 (D.C. Cir. 1996) (explaining that section 30109(a)(8) is "purposely designed to

ensure fairness not only to complainants but also to respondents" and that "Congress, whose

members are elected every two or six years, knew full well that complaints filed shortly before

elections, or debates, might not be investigated and prosecuted until after the event" but

nevertheless chose not "to allow judicial intervention in the face of such exigencies").  As we

have explained, the statutory 120-day period after which an administrative complainant may file

suit is simply a jurisdictional threshold, not a timetable within which the agency must resolve an

administrative complaint.  *See* FEC Br. at 4-5; *FEC v. Rose*, 806 F.2d 1081, 1092 (D.C. Cir.

1986); *Stockman v. FEC*, 138 F.3d 144, 152 (5th Cir. 1998) (FECA "does not create a deadline in

which the FEC must act" on administrative complaints).

## II.    CDP LACKS COMPETITIVE STANDING BECAUSE IT DOES NOT COMPETE WITH THE ADMINISTRATIVE RESPONDENTS AND MERELY SPECULATES THAT PURPORTED WRONGDOING WILL REOCCUR

CDP relies heavily on claims of competitive standing, but those claims are insufficient

because CDP does not compete with the alleged administrative respondents, and its complaints

about a potential agency enforcement action are too remote and speculative to support standing.

A participant in the political system may have competitor standing when it suffers an injury from

having to compete in an "illegally structured" competitive environment.  *LaRoque v. Holder,* 650

F.3d 777, 787 (D.C. Cir. 2011) (internal quotation marks omitted).  For example, in 2005, the

D.C. Circuit held that then-Members of Congress Christopher Shays and Martin Meehan had

competitor standing to challenge FEC regulations as being contrary to FECA because the

Members claimed that the regulations would harm their ability to compete in future elections.

*See Shays v. FEC*, 414 F.3d 76, 82, 85–87 (D.C. Cir. 2005); *see also LaRoque*, 650 F.3d at 788

(holding that plaintiff had competitor standing in Voting Rights Act case because it would impact the plaintiff's likelihood of winning in a future election).  But CDP is not a "competitor" of the 2016 Clinton campaign, its joint fundraising committee, the DNC, or state parties.  And CDP is merely speculating that the allegedly illegal conduct it says occurred in 2016 will be repeated in 2020 and cause it harm sufficient to support standing.

### A.      CDP Is Not a Competitor of Any of the Administrative Respondents

It is a bedrock requirement of competitor standing that a plaintiff asserting standing on that basis actually is a "competitor."  In this circuit, "already established candidates have been found to have standing to challenge an 'assertedly illegal benefit' being conferred *upon someone with whom those candidates compete*."  *Hassan v. FEC,* 893 F. Supp. 2d 248, 254 n.6 (D.D.C. 2012) (quoting *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998)), *aff'd*, No. 12-5335, 2013 WL 1164506 (D.C. Cir. Mar. 11, 2013); *see also Gottlieb*, 143 F.3d at 621 (requiring a plaintiff to "show that he personally competes in the same arena with the same party to whom the government has bestowed the assertedly illegal benefit"); *Fulani v. Brady*, 935 F.2d 1324, 1327 (D.C. Cir. 1991) ("Unquestionably, there is such a concept as 'competitor standing.' That standing has been recognized in circumstances where a defendant's actions benefitted a plaintiff's competitors, and thereby caused the plaintiff's subsequent disadvantage.").  The simplest application of competitor standing involves a candidate suing because of a purportedly unfair advantage given to other candidates.  *See, e.g., Shays*, 414 F.3d 76 (plaintiffs were Members of Congress who intended to run for reelection and were challenging FEC regulations); *LaRoque*, 650 F.3d at 788 (plaintiff planned to run for city council and challenged a referendum changing elections from partisan to non-partisan); *Buchanan v. FEC*, 112 F. Supp. 2d 58, 63–64 (D.D.C. 2000) (candidate for President challenged his exclusion from candidate debates).

By contrast, a political action committee like CDP lacks competitor standing to challenge a benefit given to a candidate if that benefit is granted solely to candidates, because they are not competitors in the same "arena."  *See Gottlieb*, 143 F.3d at 621 ("AmeriPAC cannot claim standing as a 'competitor' of the Clinton campaign because it was never in a position to receive matching funds itself.  Only another candidate could make such a claim.").  Similarly, voters cannot assert competitor standing just because the candidate they favor has been disadvantaged by some law or application of law, because that harm is to the candidate and does "not impede the voters from supporting the candidate of their choice." *Id.* at 622; *see also Buckley v. Valeo,* 424 U.S. 1, 94 (1976) ("[T]he denial of public financing to some Presidential candidates is not restrictive of voters' rights ....").  Any plaintiff asserting competitor standing due to an unlawful benefit granted to someone else must show that that plaintiff would have an equal opportunity to receive that benefit.  *See Hassan*, 893 F. Supp. 2d at 255 (dismissing for lack of standing because "Plaintiff cannot show that he personally competes in the same arena with candidates who receive funding under the Fund Act because he has not shown that he is or imminently will be eligible for that funding.")

The same-arena principle forecloses competitive standing in this case.  CDP is a nonconnected PAC.  11 C.F.R. § 106.6(a).  It alleges it has filed an administrative complaint with the FEC against Hillary Clinton, her 2016 Presidential campaign committee, her 2016 joint fundraising committee, the DNC, and various state Democratic parties about their joint fundraising activities.  These alleged administrative respondents do not compete with CDP.  CDP is not a candidate, political party, or joint fundraising committee; it has not alleged that it made or received any contributions from a joint fundraising committee; and it does not operate under the same set of rules as the respondents.  As the Commission explained, after receiving

proceeds from a joint fundraising committee or other receipts, national party committees and state party committees can transfer funds to each other without limitation.  (FEC Br. at 3.)  CDP, since it is not a political party committee, can do no such thing.  Although CDP emphasizes that it spent money supporting the 2016 presidential campaign of Donald Trump and suggests that it has been harmed by allegedly illegal actions of Hillary Clinton's campaign and associated entities (CDP Opp. at 18-19), what it really seems to be claiming is that Trump's candidacy was harmed because his campaign allegedly did not engage in similar conduct.  CDP's position in that regard is similar to that of a voter who lacks standing to bring a suit claiming that his or her favored candidate has been disadvantaged.

CDP appears to suggest that competitor standing is generally available to any actor engaged in partisan politics, but none of the cases on which CDP relies supports such a broad proposition.  CDP claims that *Common Cause v. FEC* stands for the idea that PACs can assert competitive standing in this sort of case, but in fact that court explicitly declined to make any such judgments about the scope of the competitive standing doctrine.  108 F.3d at 419 n.1 ("Common Cause does not even assert a 'political competitor' theory of standing in this case. . . .We therefore decline to address the 'political competitor' standing issue.")  CDP also suggests that *Chamber of Commerce of the United States. v. FEC* lends support to its argument, but that decision merely indicated that the Chamber of Commerce could have a "political competitor," without identifying who that political competitor might be.  69 F.3d 600, 603 (D.C. Cir. 1995). Nothing in that opinion supports the notion that a group like the Chamber of Commerce would have standing to bring a claim because a candidate or her campaign received some benefit. Lastly, CDP points to *International Association of Machinists & Aerospace Workers v. FEC*, 678 F.2d 1092, 1098–99 (D.C. Cir. 1982), but that case never mentions the doctrine of competitive

standing at all, because it had not even been recognized in this Circuit at the time.  *See Fulani*, 935 F.2d at 1327 ("Fulani . . . seeks to ground her claim in an application of 'competitor standing' theory, an application not recognized previously in this Circuit.").  In any case, later opinions make clear that *Machinists* does not support the idea that political actors can sue over benefits afforded to other types of political actors.  *See Gottlieb*, 143 F.3d at 622 (stating that *Machinists*, which involved a union's objections to the solicitation provisions FECA established for corporate PACs, "held that the union's influence had been diminished 'relative' to [that of] corporate PACs" but "did not concern the diminution of individual voters' influence on an election.").

Because CDP does not compete in the same political arena as the administrative respondents that it wants the Commission to enforce the law against, CDP lacks competitor standing to bring this lawsuit.

**B.**    **CDP Merely Speculates That the Alleged Conduct of Certain Persons in 2016 Indicates That It Will Be Forced to Participate in an Illegally Structured Environment in 2020**

Even if this Court were to determine that CDP is a political "competitor" capable of bringing this type of lawsuit, the Court would still lack subject matter jurisdiction because CDP can only speculate that it might be forced to participate in an illegally structured environment in the future.  A plaintiff cannot establish competitor standing by merely alleging it competed in an illegally structured environment in the past; it must also establish that there is a likelihood it will do so in the future.  *See Nader v. FEC*, 725 F.3d 226, 228–29 (D.C. Cir. 2013) (holding that candidate Ralph Nader lacked competitive standing to bring a suit against the FEC for failure to enforce FECA violations against persons associated with his competitor John Kerry's campaign because the alleged violations had occurred years earlier and Nader lacked concrete plans to run

for office again).[2]  CDP asserts that it competed in an illegally structured environment in 2016.

(*See* CDP Opp. at 18 ("The FEC's refusal to timely — if at all — enforce various campaign

finance restrictions against the DNC, state Democratic parties, and other entities placed CDP at a

competitive disadvantage in the 2016 presidential election . . . ."); *id.* at 21 ("Those illegally

obtained hard-money funds allowed the DNC and Clinton Campaign to participate to an

improperly greater extent in the 2016 presidential election in support of Clinton's candidacy,

thereby relatively diminishing CDP's voice in support of Trump.").)  Under *Nader*, those

assertions are insufficient to show CDP has standing to bring this case.  725 F.3d at 228-29.

CDP's administrative complaint was not filed until December 2017 and there is no way the

FEC's purported delay in this enforcement matter could have altered the 2016 election.  *See*

*Herron for Cong. v. FEC*, 903 F. Supp. 2d 9, 13 (D.D.C. 2012) (finding a lack of standing in part

because "Herron alleges that he was wronged in an election that came to a close nearly two years

ago.  Of course, this court has no power to alter the past.")

 Nor is it sufficient for a plaintiff like CDP to merely point to a future election and

speculate about the possibility of an illegally structured environment to come.  For example, in

*Herron for Congress*, former Congressional candidate Roy Herron sued the FEC for allegedly

failing to act on his administrative complaint alleging that his political opponent Steven Fincher

had obtained an unlawful bank loan and failed to report it.  903 F. Supp. 2d at 11.  The district

court dismissed the case for lack of jurisdiction, because a plaintiff seeking to establish

---

[2]      CDP's failure to make a cognizable claim for prospective relief may be more properly
considered to be a problem of its claims having become moot rather than an indication of a lack
of standing.  *Herron for Cong.*, 903 F. Supp. 2d 9, 13-14 (D.D.C. 2012).  The FEC was unable to
raise the issue of mootness sooner because CDP did not assert competitor standing in its
complaint, instead raising it for the first time in its opposition.  In any event, mootness is
jurisdictional and cannot be waived.  *DeFunis v. Odegaard*, 416 U.S. 312 (1974).

competitive standing cannot simply suggest the "theoretical possibility" that the behavior at issue

will reoccur, but rather must "show a demonstrable probability that he will be 'subjected to the

same action again.'" *Id.* at 14, 15 (citing *Pharmachemie B.V. v. Barr Labs., Inc*., 276 F.3d 627,

633 (D.C. Cir. 2002)).  The *Herron* opinion noted that such a requirement is "easily met" when

the challenge is to federal regulations (as in *Shays*) or to events, like presidential debates, that

"are certain to accompany every election cycle, even if they are not written into law."  *Id.* at 14-

15.  But the court found that Herron had failed to meet this burden because his challenge was to

the lack of enforcement of a "one-time event" and he had failed to submit "any evidence to

suggest that these events will occur [in the future]."  *Id*. at 15.  To establish jurisdiction, the court

explained, Herron would need to "establish that (1) Fincher will run for Congress again, (2)

Fincher will again receive a bank loan, (3) Fincher will again fail to disclose the loan in a timely

fashion, and (4) the loan will violate applicable FEC regulations."  *Id.*

CDP's arguments about the 2020 election in this case are as speculative as Herron's.

CDP asserts that there is a "substantial likelihood" that the Commission's treatment of its

administrative complaint will result in an illegally structured environment in 2020 (CDP Opp. at

17), but CDP provides no reason why that outcome is likely based on the alleged 2016 actions of

a group of actors led by the Clinton campaign.  The Democratic Presidential nominee in 2020 is

unknown, but CPD provides no reason to believe it will once again be Hillary Clinton and fails

to demonstrate a likelihood that the candidate ultimately chosen will engage in the type of

allegedly unlawful fundraising CDP describes here.  Because CDP has not shown a probability

that the illegal conduct it has alleged took place in 2016 will occur again in 2020, it is merely

speculating that it may "be forced to advocate for its preferred presidential candidate . . . in an

illegally structured environment" and that it will "suffer continued 'relative diminution' of its

voice" and be "at a competitive disadvantage."  (CDP Opp. at 20, 22 (quoting *Machinists*, 678

F.2d at 1098), 23.)  Such claims are insufficient to support competitive standing.

### III.   CDP LACKS INFORMATIONAL STANDING BECAUSE IT MERELY SEEKS DETERMINATIONS ABOUT THE LEGALITY OF ALLEGED CONDUCT THAT HAS ALREADY BEEN REPORTED

As the FEC noted, a plaintiff may have informational standing if "he is directly deprived

of information that must be disclosed under a statute."  (FEC Br. at 13 (quoting *CREW v. U.S.

Dep't of the Treasury, IRS*, 21 F. Supp. 3d 25, 32 (D.D.C. 2014)).)  But a plaintiff's deprivation

must involve the lack of *factual* information, not merely the lack of knowledge about whether a

violation of FECA has taken place.  *Common Cause*, 108 F.3d at 418 (holding that a desire "for

the Commission to 'get the bad guys'" is not legally cognizable).  Because CDP's administrative

complaint here seeks legal conclusions rather than factual information, the group lacks

informational standing.  (*See* FEC Br. at 14-16.)

CDP's real interest is evident from the declaration of its chairman that is attached to

CDP's opposition to this motion to dismiss.  According to that declaration, CDP's interest in this

case is to engage in a public campaign with the following two purposes:

> a. Inform the public of the illegality of the DNC and Democratic party's financial machinations to deter people from supporting or contributing to the eventual Democratic nominee for President; and
>
> b. Educate the public about the illegality of unreported strawman or conduit contributions, illegal circumvention efforts, illegally excessive contributions, and false FEC reporting.  The Democratic Party engaged in a more than year long, nationwide scheme to funnel $84 million involving the DNC, up to 40 state parties, and a presidential candidate; CDP wishes to dispel any public misperception such blatant, persistent, extensive conduct was legal.

(Decl. of Ted Harvey ¶ 10 (Docket No. 14-1).)  In other words, CDP's interest in this case is not

to determine whether any individual or committee contributed or transferred money as a means

to determine the associations between those parties, as might occur where an interest was based

on a true lack of information FECA required to be reported.  Rather, CDP wants the FEC to determine that $84 million in already-reported transfers and contributions were unlawful, so that that illegality can be publicized.  But such an interest presents no cognizable injury to CDP.

Cases in which plaintiffs have shown informational standing to sue the FEC have involved the pursuit of substantive information about transactions that are required to be reported, rather than merely whether known actions were lawful.  For example, the plaintiffs in *FEC v. Akins* had ideological positions regarding Israel and wanted information about the connections between the American Israel Public Affairs Committee ("AIPAC") and various candidates so that they would be able to "evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election."  524 U.S. 11, 21 (1998).  In this case, CDP's filings indicate that it knows from existing reports the persons who made contributions, that the DNC raised money in conjunction with Hillary Clinton's campaign and state Democratic parties, and that the state Democratic parties transferred extensive funds to the DNC, including through the financial transactions that CDP describes in detail.  But CDP fails to show how, for example, if the FEC's enforcement actions lead to some reports being corrected for some transactions that earlier were not disclosed by one of two reporting entities, such corrections would have any material impact on CDP's planned public campaign.  That campaign is entirely an effort to publicize CDP's efforts to have the FEC to get purported "'bad guys,'" *Common Cause*, 108 F.3d at 418, not an effort to provide new information about the sources of financial assistance to federal political committees.  (*See* Decl. of Ted Harvey ¶ 4.b (Docket No. 14-1).)

CDP's purpose of publicizing the lawfulness of the alleged respondents' conduct is apparent.  For example, reports filed with the FEC indicate that some individual contributions

made to the Hillary Victory Fund were then transferred to Democratic state parties, who

thereafter transferred the same or similar amounts of money to the DNC.  CDP argues that if the

contributors had intended for the money to be rerouted in this way, or if the state parties had

entered an agreement to make such transfers automatically, then FECA and FEC regulations

might require that those contributions be reported as having been made directly to the DNC.

(CDP Opp. at 26-27 (citing 52 U.S.C.  § 30116(a)(8) and 11 C.F.R. § 110.6(b)(1)).)  However,

this amounts to claims about whether those transactions should have been reported in a different

way and about the legality of the transactions.  Reporting violations are serious matters, but CDP

has no cognizable interest in the recharacterization of information it already knows.  Similarly,

CDP points to alleged inconsistencies between the reports of some state parties and the DNC and

Hillary Victory Fund, specifically instances in which the Hillary Victory Fund reported

transferring money to a state party, and the DNC reported receiving money from that same state

party, but the state party did not report having received or transferred that money.  But again,

correcting these alleged errors would not tell CDP any new information about the parties other

than that they may have committed a reporting violation.  All of the alleged respondents are

associated with the Democratic Party and are linked in their electoral goals.  Amended reports in

which the state parties added receipts and expenditures in accord with reporting of the DNC and

the Hillary Victory Fund would not add significantly to the CDP's knowledge of these entities

and CDP's purported lack of any such information does not cause CDP any cognizable injury.

Furthermore, as the Commission explained, even if some statutorily required factual

information was unreported, a party only has informational standing if that information would be

useful in voting.  (FEC Br. at 16-18 (citing *Akins*, 524 U.S. at 24-25; *Common Cause*, 108 F.3d

at 418; *All. for Democracy*, 335 F. Supp. 2d at 48; *CREW v. FEC*, 475 F.3d 337, 339 (D.C. Cir.

2007); *CREW v. FEC*, 401 F. Supp. 2d 115, 121 (D.D.C. 2005)).)  In response to these many

cases, CDP principally relies on *Kean for Congress Committee v. FEC*, a district court decision

from 2005.  398 F. Supp. 2d 26 (D.D.C. 2005).  But the plaintiff in *Kean*, just like the plaintiffs

in *Akins*, wanted factual information, not merely a determination of wrongdoing.  In that case,

Congressional candidate Tom Kean, Jr. had been subjected to a negative advertising campaign

from a mysterious group known as "CRG" that had not disclosed any of its contributions or

expenditures.  *Id.* at 29.  The plaintiff, Kean's campaign committee, was found to be injured

because without the legally required information from CRG, it could not determine if "CRG is an

organization that enjoys wide support by multiple donors or relatively few[,] whether CRG's

support comes primarily from in-state or out-of-state contributors/voters," and whether "Mr.

Kean would be a viable federal candidate in the future."  *Id*. at 35.  While it is true that the

plaintiff in *Kean* was not seeking information that would be useful for its voting, it nonetheless

was seeking underlying information about who was funding CRG, and not just a determination

that CRG was acting unlawfully.  That distinguishes *Kean* from this case, where CDP already

knows the contributors to Hillary Victory Fund and where their contributions went.

In any event, though CDP relies (CDP Opp. at 29-30) on the district court opinions in

*Kean* and *Campaign Legal Center v. FEC*, 245 F. Supp. 3d 119, 127 (D.D.C. 2017), the great

weight of authority in this Circuit indicates that usefulness to voting is a hallmark of the judicial

inquiry into standing in the context of section 30109(a)(8).  (*See* FEC Br. at 16-18 (citing *Akins*,

524 U.S. at 24-25; *Common Cause*, 108 F.3d at 418; *All. for Democracy*, 335 F. Supp. 2d at 48;

*CREW*, 475 F.3d at 339; *CREW*, 401 F. Supp. 2d at 121).)[3]  In addition, just last year a court in

---

[3]      Under the analysis in *Campaign Legal Center v. FEC*, this case is comparable to the
matters discussed there where the administrative complaints essentially sought legal

this district dismissed for lack of standing another case that was very similar to this one, with

plaintiffs seeking a determination of illegality rather than factual information.  In *CREW v. FEC*,

the plaintiffs argued that they needed certain information about a corporation and its corporate

PAC to "ferret out corruption" so that they could publicize that illegal conduct.  267 F. Supp. 3d

at 55.  The court dismissed the matter because "an interest in knowing or publicizing that the law

was violated is akin to claiming injury to the interest in seeing the law obeyed, which simply

does not present an Article III case or controversy."  *Id.*  This Court should dismiss this case for

the same reason.

## IV.    CDP LACKS ORGANIZATIONAL STANDING BECAUSE IT DID NOT DIVERT RESOURCES AS A RESULT OF ALLEGED VIOLATIONS BY RESPONDENTS

The FEC explained in its opening brief that CDP also lacks organizational standing

because an organizational plaintiff that brings suit on its own behalf, as CDP does, "must

establish 'concrete and demonstrable injury to the organization's activities — with [a]

consequent drain on the organization's resources — constitut[ing] . . . more than simply a

setback to the organization's abstract social interests.'"  (FEC Br. at 19 (quoting *Common Cause*,

108 F.3d at 417).)  CDP responds by claiming that the FEC's alleged delay in acting on its

administrative complaint has caused and will cause CDP to divert resources it could use for other

activities.  (CDP Opp. at 31.)  But CDP's argument directly contradicts arguments it makes

elsewhere in its brief, and even if CDP had diverted resources to publicize this issue, the alleged

violations of the administrative respondents did not cause that diversion.  It is clear that "abstract

social interests" are all that CDP has at stake in this matter.

---

determinations, not the matters where the true sources of contributions were in doubt.  245 F.
Supp. 3d at 125-27.

17

CDP's own positions undermine its organizational standing claims.  In trying to show informational standing, CDP claims that it needs the FEC to act so that it can "use the information it obtains from corrected, completed, and updated reports to enhance the accuracy, specificity, and utility of its public communications."  (CDP Opp. at 30.)  In other words, CDP has already been publicizing the alleged violations of the administrative respondents, but it says it needs the FEC to act so it can publicize that wrongdoing better.  (*Id.*)  But in CDP's attempt to show that it has organizational standing, it makes contrary claims.  CDP asserts that the FEC's alleged delay has caused CDP to spend "hundreds of thousands of dollars to both publicize the DNC's conduct and educate the public about the illegality of such schemes," but if the Commission would act on CDP's administrative complaint, "CDP would be able to redirect resources from educating the public — both about the fact that the DNC engaged in such illegal conduct, and that such schemes are prohibited by federal law despite the Democratic party's decision to engage in them — to other means of achieving its programmatic goals."  (*Id*. at 32.) In other words, rather than devoting more attention to the alleged illegality, CDP would be able to devote less.  CDP cannot have it both ways.

In any event, CDP's alleged diversion of resources is plainly associated with publicizing its claims that the alleged administrative respondents acted illegally, as well as with CDP's filing of the administrative complaint and this lawsuit, rather than with any lack of information that FECA requires to be disclosed or any other harm to its programmatic activities.  (CDP Opp. at 31.)  CDP cannot bootstrap its voluntary choices in this regard into a "concrete and demonstrable injury" sufficient to support standing.  *Common Cause*, 108 F.3d at 417.  CDP filed its administrative complaint almost a year after the last of the underlying transactions about which it complains.  CDP has offered no evidence that it diverted resources due to those transactions.

**V.      CDP DOES NOT HAVE A RIGHT TO AN FEC INVESTIGATION ON A PARTICULAR TIME FRAME AND LACKS PROCEDURAL STANDING**

Lastly, CDP claims that it has procedural standing because the FEC has allegedly failed to meet the requirements of FECA by not acting quickly enough on CDP's administrative complaint (CDP Opp. at 32-34), but that argument also fails.  As an initial matter, the alleged procedural breach in this case is easily distinguished from the environmental procedural requirements in the cases CDP cites.  For example, in *Florida Audubon Society v. Bentsen*, a government agency had entirely failed to include a required environmental impact statement when it clarified an existing rule.  94 F.3d 658, 662 (D.C. Cir. 1996).  That type of situation involves a discrete procedural requirement.  By contrast, as described *supra* pp. 5-6, FECA does not set any specific time limit on how long the Commission can take to complete an enforcement matter, and whether a delay is unreasonable is a matter for judicial evaluation.  As a result, CDP has no procedural right comparable to those found in the cases on which it relies.

And even if the FEC had failed to meet a procedural requirement, CDP can only claim standing on that basis if it can show "a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest."  *Fla. Audubon Soc'y*, 94 F.3d at 664–65.  CDP claims an interest in bringing its own lawsuit against the administrative respondents in the event that the Commission dismisses CDP's complaint, and then a Court determines that dismissal is contrary to law, and then the FEC nonetheless fails to conform with the Court's order.  (CDP Opp. at 33 (citing 52 U.S.C. § 30109(a)(8)(A)).)  But an alleged delay in the remote possibility of CDP gaining such a private right of action does not represent a "reasonably increased risk of injury."  CDP relies on a highly speculative and hypothetical chain of events.  It is unlikely that the FEC will reach a decision that is contrary to law and then refuse to fix that decision despite a court order, and the

likelihood that CDP would bring an action against the administrative respondents that would be undermined due to the FEC's purported delay is even lower.

In a final effort to show that the FEC's alleged inaction would injure CDP, plaintiff argues that because 52 U.S.C. § 30102(d) normally requires political committees to retain records for only three years, any delay by the Commission in pursuing enforcement threatens to "increase the likelihood that the DNC and state Democratic parties will destroy the evidence." (CDP Opp. at 34.) This argument fails for the same threshold reason as above, that CDP does not have a clear procedural right to assure that the alleged respondents suffer consequences for alleged wrongdoing under any particular time frame. But in any case, 18 U.S.C. § 1519 provides that it is unlawful if any of these persons "knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . ." Any notification letters sent in an FEC administrative enforcement matter remain confidential pursuant to 52 U.S.C. § 30109(a)(12), but the standard letter that the FEC sends out to notify respondents in such matters specifically notes this record preservation requirement. *See*, *e.g.*, Letter from Jeff S. Jordan, Assistant General Counsel, FEC, to Burchett for Congress (Feb. 22, 2018) ("Please note that you have a legal obligation to preserve all documents, records and materials relating to the subject matter of the complaint until such time as you are notified that the Commission has closed its file in this matter. See 18 U.S.C. § 1519."), https://www.fec.gov/files/legal/murs/7326/18044445595.pdf. The records preservation risk that CDP claims does not support procedural standing in this case.

20

## VI.    CONCLUSION

For the foregoing reasons, plaintiff CDP lacks Article III standing and the Court should

dismiss CDP's Complaint with prejudice.[4]

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)          Harry J. Summers
Acting General Counsel                           Assistant General Counsel
lstevenson@fec.gov                               hsummers@fec.gov

Kevin Deeley                                     /s/ *Seth Nesin*
Associate General Counsel                        Seth Nesin
kdeeley@fec.gov                                  Attorney
                                                 snesin@fec.gov

July 27, 2018                                    FEDERAL ELECTION COMMISSION
                                                 1050 First Street NE
                                                 Washington, DC  20463
                                                 (202) 694-1650

---

[4]    In the last sentence of its brief, CDP "seeks leave to amend its complaint as necessary to remedy jurisdictional concerns" if the Court should grant the FEC's motion to dismiss.  (CDP Opp. at 34 (citing Fed. R. Civ. P. 15(a)(2)).)  But this request is improperly presented and completely unsupported.  As an initial matter, such a request should be made by motion "accompanied by an original of the proposed pleading as amended."  LCvR 15.1.  Moreover, CDP's original complaint should have contained information sufficient to support its standing, and it has filed an opposition to this motion arguing numerous standing theories, accompanied by two declarations that attempt to provide the necessary information.  Federal Rule 15(a)(2) states that the Court should only grant a request to amend a complaint at this stage of the litigation if "justice so requires," and CDP has provided no justification as to why it should be permitted to try again to meet its standing burden.  This is particularly true given that CDP's request does not even try to explain how the jurisdictional defects in its original complaint could be remedied.